**TAUNTON MUNICIPAL LIGHTING PLANT, Plaintiff,**

v.

**QUINCY OIL, INC., Defendant.**

**TAUNTON MUNICIPAL LIGHTING PLANT, Plaintiff,**

v.

**DEPARTMENT OF ENERGY et al., Defendants.**

Civ. A. Nos. 78–2233–C, 79–829–C.

United States District Court,
D. Massachusetts.

Aug. 26, 1980.

Bonnie S. Blair, Cynthia Schneider Bogorad, Spiegel & McDiarmid, Washington, D. C., Edward A. Roster, Roster & Antine, Taunton, Mass., for plaintiffs.

Stuart E. Schiffer, Asst. Atty. Gen., Barbara L. Gordon, C. Max Vassanelli, Dept. of Justice, Washington, D. C., Asst. U. S. Atty., Carolyn Grace, Boston, Mass., Mark Kreitman, David Engles, U. S. Dept. of Energy, Regulatory Litigation Div., Washington, D. C., for Federal defendants.

David S. Mortensen, J. Barry Morrissey, Timothy H. Gailey, Hale & Dorr, Boston, Mass., for intervenor Quincy Oil, Inc.

### MEMORANDUM

CAFFREY, Chief Judge.

Before the Court are two related civil actions involving the proper application of Federal Energy Administration (now Department of Energy) mandatory petroleum price regulations to variable–price petroleum supply contracts. In Civil Action No. 78–2233–C, the Taunton Municipal Lighting Plant (Taunton) seeks money damages alleged to be due to it because of violations of the mandatory petroleum price regulations by Quincy Oil, Inc. (Quincy) during the period November 1, 1973 through May 31, 1976. In Civil Action No. 79–829–C, Taunton challenges the validity of DOE Ruling 1979–1 as well as the DOE's withdrawal of a Remedial Order (RO) previously issued against Quincy. The background of this dispute between Taunton, Quincy and DOE is fully set forth in earlier rulings by this Court. *Quincy Oil, Inc. v. FEA*, 468 F.Supp. 383 (D.Mass.1979), and 472 F.Supp. 1233 (D.Mass.1979), *aff'd*, 620 F.2d 890 (Em.App. 1980); *Taunton Municipal Lighting Plant v. DOE*, 472 F.Supp. 1231 (D.Mass.1979), *aff'd on other grounds*, 620 F.2d 896 (Em.App. 1980).

There is no dispute as to the facts surrounding the business dealings between Taunton and Quincy. In April, 1972 Quincy entered into a variable–price contract to supply No. 6 fuel oil to Taunton for a one–year period which ran from May 1, 1972 through April 30, 1973. The contract contained a clause which conferred authority on Taunton to extend unilaterally the supply contract for an additional 90 days beyond April 30, 1973 at the same price. On April 23, 1973, Quincy and Taunton entered into another variable–price contract in which Quincy agreed to supply No. 6 fuel oil to Taunton for the period May 1, 1973 through April 20, 1974. Taunton exercised its 90–day option under the April, 1972 contract, and Quincy continued to make deliveries at prices established under the terms of the old contract until July 31, 1973. Deliveries under the new contract commenced August 1, 1973.

These cases are now before the Court on several motions for summary judgment. In No. 78–2233–C, Quincy has moved for summary judgment on the ground that it lawfully used as its base price under the mandatory petroleum price regulations the price specified in the new variable–price contract rather than the price charged for oil actually delivered on May 15, 1973. Quincy thereby seeks to uphold the position taken by the DOE in Ruling 1979–1. In 79–829–C, Taunton has moved for summary judgment on the grounds that the DOE improperly withdrew the RO and that Ruling 1979–1 is invalid. Taunton contends that Quincy was required by the price regulations to use as its base price the price charged in actual deliveries on May 15, 1973. Alternatively, Taunton argues that, even if Ruling 1979–1 is a valid construction of the price regulations, nevertheless Ruling 1979–1 as applied to the facts of this case required Quincy to calculate prices based on the old contract rather than the new contract. Since both these summary judgment motions concern the general validity of Ruling 1979–1 and its application to the transactions between Taunton and Quincy, the Court will treat them as cross–motions for summary judgment.

Pursuant to the authority of the Economic Stabilization Act of 1970 (ESA), 12 U.S.C.A. § 1904 note, and the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C.A. § 751 *et seq.*, the FEA promulgated regulations establishing the maximum

allowable price which a reseller of refined petroleum products may charge. The basic rule, subject to exceptions not here relevant, is that:

"[A] seller may not charge a price for an item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in *transactions* with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a dollar–for–dollar basis, increased costs on the item." 10 C.F.R. § 212.93(a) (emphasis added).

The term "transaction" is defined in the regulations as an "arms–length sale between unrelated persons" and is "considered to occur at the time and place when a binding contract is entered into between the parties," 10 C.F.R. § 212.31. This definition was originally adopted in 1973 by the Cost of Living Council (CLC) and was later adopted by the FEA. *Gulf Oil Corp. v. Schlesinger*, 465 F.Supp. 913 (D.C.Pa.1979).

On March 21, 1977 the FEA issued Ruling 1977–5 purporting to clarify the proper meaning and application of the definition of transaction. The Ruling provides that, when a contract has a variable price term:

[T]hat such a . . . contract is merely a general sales agreement which, because of its lack of a fixed price that would reflect market level prices on the date the contract was entered into, cannot be regarded as a "binding contract" for purposes of the definition of "transaction" and the computation of May 15, 1973, selling prices. Within the framework of such a general sales agreement, one or more subsidiary contracts occur, and they are presumed to have been entered into on the date the price becomes fixed with respect to a particular delivery. At that time a fixed price is specified with respect to a particular delivery pursuant to the terms of a general sales contract, a "binding contract" arises for purposes of the definition of "transaction." 42 Fed.Reg. 15306.

Thus Ruling 1977–5 adopted for variable-price contracts a so–called "shipment-based" definition of the term transaction, under which a transaction occurs at the time a price is fixed with regard to a particular delivery rather than at the time a variable price contract is entered into. The RO issued against Quincy was predicated on this shipment–based definition of the term transaction.

On April 13, 1979, DOE issued Ruling 1979–1, which declared that Ruling 1977–5 is erroneous to the extent that it fails to consider the entry into a variable price contract to constitute a transaction as defined in the mandatory petroleum price regulations:

"[W]ith respect to sales of covered products made pursuant to a written variable–price contract, DOE is of the view that a transaction must be deemed to have occurred for purposes of the price regulations on the date when a binding contract was entered into between the parties. The transaction price is the price lawfully charged pursuant to the terms of such contract in deliveries occurring on May 15, 1973 or on the most recent day preceding May 15, 1973. If no such deliveries occurred, the transaction price is the price that would have been charged under the terms of the contract had a sale occurred on the day the contract was entered into."

The DOE thereby adopted the interpretation urged by Quincy, the so–called "contract–based" definition. Under this interpretation, a transaction occurs at the time a variable price contract is entered into not at the time each discrete delivery takes place pursuant to that contract. Based on Ruling 1979–1, the DOE withdrew the RO. Thereafter, an action which had been filed by Quincy challenging the validity of both the RO and Ruling 1977–5 was dismissed as moot. *Quincy Oil, Inc. v. FEA*, 472 F.Supp. 1233 (D.Mass.1979), *aff'd*, 620 F.2d 890 (Em. App.1980).

In *Exxon Corp. v. DOE*, No. 3–77–1158–W, 4 Energy Mgt. ¶ 26,149 (N.D.Tex. June 8, 1979), the court faced a challenge to Ruling 1977–5 on both substantive and procedural grounds. The court first reviewed

the background of the mandatory price controls:

> Events leading to this action include the institution of wage and price controls in the United States in August of 1971. Enforcement of these controls has been in four so–called "phases." DOE is now the administrative agency that oversees the controls that pertain to the subject matter of this suit. During Phases I and III, sometimes called the "freeze" periods, the agency administering the controls, as they pertained to the oil and gas industry, applied a shipment date definition to the "transaction" term. During Phases II and IV the "transaction" definition referred to the date that a binding contract was entered into between a buyer and seller. In Phases I and III the date of the delivery of the product determined the date of the transaction while in Phases II and IV the date of the transaction was defined as the time when a binding contract was entered into by the parties. *Id.* at p. 27,317.

The Court then considered plaintiff's substantive challenge to Ruling 1977–5. The plaintiffs contended that Ruling 1977–5 was an attempt to substitute in the context of variable–price contracts a "shipment–based" definition of transaction, the definition extant in Phases I and III. Plaintiffs argued that this interpretation was inconsistent with the plain language of the transaction definition, 10 C.F.R. § 212.31, that it was contrary to state law governing when variable–price contracts become binding, and that it contradicted the agency's own contemporaneous interpretation of the transaction definition. Thus, plaintiffs contended, the agency's action in promulgating Ruling 1977–5 was arbitrary and capricious. In opposition, the DOE argued that its own interpretation of the transaction definition was due great deference and, furthermore, that it was not bound by informal interpretations that contradict its formal interpretation as set out in Ruling 1977–5.

In *Exxon* the Court upheld the plaintiffs' contention that Ruling 1977–5 was substantively invalid. The court first determined that the transaction definition was not ambiguous and that the agency's interpretation of the definition was due no deference because it was plainly inconsistent with the definition. Thus, the court held that the date a variable–price contract is entered into is the date it becomes binding and constitutes a transaction for purposes of the mandatory petroleum price regulations. The court further buttressed its decision by reference to state law. Specifically, the court noted that Section 2–305 of the Uniform Commercial Code allows parties to enter into a binding contract even though the price term is to be fixed by reference to a market indicator. Moreover, the court found plaintiffs' position supported by the interpretations made by the agency itself during the regulatory period:

> Although defendants argue that the statements of agency officials made under "informal" circumstances cannot be considered by this court, the Temporary Emergency Court of Appeals has recently concluded that ". . . statements by the FEA auditors and other lower officials are entitled to weight in determining . . . consistency with earlier and later pronouncements." *Standard Oil Co. v. Department of Energy*, [596 F.2d 1029, 1056 (Em.App.1978)]. The depositions and affidavits submitted in this case are uncontradicted on the question of the interpretation given by DOE to the "transaction" definition prior to promulgation of 1977–5. These exhibits demonstrate that Mr. Vipperman, the FEA Regional Counsel and Director of the Office of Price and Wage Controls, as well as others in responsible positions within the agency, consistently advised plaintiffs, other refiners, and the agency's own auditors that variable price contracts were to be considered "transactions" on the date a binding contract was entered into by the parties, which generally was the date it was signed. *Id.* at p. 27,319.

The court in *Exxon* next considered plaintiffs' procedural challenge to Ruling 1977–5. Finding that the agency had failed to comply with the notice and hearing re-

quirements of both the Administrative Procedure Act and the Federal Energy Administration Act in promulgating Ruling 1977–5, the court held that Ruling 1977–5 was procedurally as well as substantively invalid.

Turning to the case at hand, Quincy in its motion for summary judgment basically seeks to uphold the "contract–based" interpretation of the transaction definition, as it applies to variable–price contracts, adopted by the DOE in Ruling 1979–1. Quincy has submitted an exhaustive brief in support of its motion detailing the various phases of price controls, the transaction definition applicable in each phase, the contemporaneous and informal interpretations given to the present transaction definition by agency officials, prior to Ruling 1977–5, and the background to Rulings 1977–5 and 1979–1. Based on this documentation, which is essentially uncontradicted by Taunton, and based on the language of the transaction definition, I rule as follows: that under the plain, unambiguous language of 10 C.F.R. § 212.31 a transaction occurs "at the time and place when a binding contract is entered into between the parties," and not at the time of actual delivery; that, on its face, the transaction definition admits of no exception for variable–price, as opposed to fixed–price, contracts; that both the history of the transaction definition and the contemporaneous applications of that definition by agency officials confirm that variable–price contracts constitute transactions on the date they are entered into; that such an interpretation of the transaction definition is consistent with the purpose of the price control regulations to accurately reflect market price levels on May 15, 1973; and that the FEA's attempt in Ruling 1977–5 to retroactively alter the plain meaning of the transaction definition was arbitrary, capricious and without support in the price regulations. I therefore agree with the decision by the court in *Exxon* to the extent that it holds that Ruling 1977–5 is substantively invalid. In light of these rulings the Court rejects the arguments made by Taunton in its motion for summary judgment that Ruling 1977–5 represents

the proper interpretation of the transaction definition, that Ruling 1979–1 is invalid, and that the DOE improperly withdrew the RO.

Taunton makes an alternative argument that, even accepting Ruling 1979–1 as the proper application of the transaction definition to variable price contracts, nevertheless Ruling 1979–1 as applied to the facts of this case still required Quincy to base its prices on the old contract rather than on the new contract. Basically Taunton contends that its exercise of the option to renew the price terms of the old contract for 90 days constituted a third contract, the so–called "extension contract;" since this extension contract was both the most recent contract and the one governing sales of oil on and around May 15, 1973, Taunton argues that it should be the governing instrument under Ruling 1979–1. After reviewing the briefs filed by Taunton and Quincy on this issue, the court is not satisfied that this issue has been adequately briefed, and, therefore, Taunton, Quincy, and the DOE are instructed to file by October 1, 1980, additional briefs, not to exceed fifteen pages in length, directed to this issue.

Pending submission of these briefs, the court defers consideration of two additional motions by Quincy: a motion for partial summary judgment in No. 78–2233–C on the ground that the statute of limitations presents a bar to most of Taunton's claims; and a motion for summary judgment in No. 78–2233–C on the ground that Taunton lacks capacity to sue. Taunton is further directed to file a response to this latter motion before October 1, 1980.

Order accordingly.