TAUNTON MUNICIPAL LIGHTING
PLANT, Plaintiff,

v.

QUINCY OIL, INC., Defendant.

TAUNTON MUNICIPAL LIGHTING
PLANT, Plaintiff,

v.

DEPARTMENT OF ENERGY et
al., Defendants.

Civ. A. Nos. 78–2233–C, 79–829–C.

United States District Court,
D. Massachusetts.

Dec. 22, 1980.

Timothy H. Gailey and, David S. Mortensen, Hale & Dorr, Boston, Mass., for defendant in No. 78–2233–C.

Bonnie S. Blair and Cynthia Schneider Bogorad, Spiegel & McDiarmid, Washington, D. C., Edward A. Roster, Roster & Antine, Taunton, Mass., Philip M. Cronin, Withington Cross Park & Groden, Boston, Mass., for plaintiff.

Stuart E. Schiffer, Asst. Atty. Gen., Barbara L. Gordon, C. Max Vassanelli, Dept. of Justice, Washington, D. C., for Federal defendants.

David S. Mortensen, J. Barry Morrissey, Timothy H. Gailey, Hale & Dorr, Boston, Mass., for intervenor Quincy Oil, Inc.

Mark Kreitman, David Engles, U. S. Dept. of Energy, Regulatory Litigation Div., Washington, D. C., for Federal defendants AUSA Carolyn Grace.

## MEMORANDUM

CAFFREY, Chief Judge.

This decision is the latest in a series of decisions by this Court involving a very narrow, yet highly controversial issue, the application of Federal Energy Administration (now DOE) mandatory petroleum price regulations to variable-price petroleum supply contracts. *Quincy Oil, Inc. v. FEA*, 468 F.Supp. 383 (D.Mass.1979), and 472 F.Supp. 1233 (D.Mass.1979), *aff'd*, 620 F.2d 890 (TECA 1980); *Taunton Municipal Lighting Plant v. DOE*, 472 F.Supp. 1231 (D.Mass. 1979), *aff'd on other grounds*, 620 F.2d 896 (TECA 1980). On August 26, 1980 this Court, 498 F.Supp. 396, considered two motions for summary judgment, in C.A. No. 78–2233–C and C.A. No. 79–829–C, as cross-motions for summary judgment, since both cases focused on the validity of Department of Energy (DOE) Ruling 1979–1. This Court upheld the validity of the Ruling and approved the DOE's withdrawal of a Remedial Order previously issued against Quincy Oil. The Court reserved judgment, however, on the cross-motions for summary judgment, pending more complete briefing on the application of DOE Ruling 1979–1 to the specific facts at issue here.

Briefs have now been submitted and this Court is prepared to rule on the cross-motions for summary judgment.

As a result of prior decisions the following factual and legal conclusions are presently undisputed. Quincy Oil entered into a one-year variable price contract for the sale of No. 6 fuel oil to Taunton Municipal Lighting Plant (Taunton) on April 18, 1972. The contract extended from May 1, 1972 to April 30, 1973. The same parties signed a second contract with similar terms one year later, on April 23, 1973. The second contract extended from May 1, 1973 to April 30, 1974 and included a price approximately $.50 more per barrel than was charged in the 1972 contract. After the second contract had been signed but before shipments had been made on the new terms, Taunton chose to exercise its right under the 1972 contract and extend those lower-priced terms for three additional months, postponing the terms of the new 1973 contract until August 1973.

Throughout this period of time the government issued various price regulations under the Economic Stablization Act of 1970 (ESA), 12 U.S.C. § 1904, and the Emergency Petroleum Allocation Act of 1973 (EPAA), 15 U.S.C. § 751 *et seq.* The parties disagree over the base price which Quincy Oil used or should have used in the sale of fuel oil to Taunton between November 1, 1973 and May 31, 1976 under 10 C.F.R. § 212.93(a).

That regulation, as applied to Quincy Oil, provided that the seller "may not charge a price ... which exceeds the weighted average price at which" the oil "was lawfully priced by the seller in transactions with" Taunton and similar purchasers "on May 15, 1973...."[1] DOE Ruling 1979–1 specified

---

1. The regulation in full reads:

(a) A seller may not charge a price for any item subject to this subpart which exceeds the weighted average price at which the item was lawfully priced by the seller in transactions with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a

that for written variable-price contracts "a transaction must be deemed to have occurred for purposes of the price regulations on the date when a binding contract was entered into between the parties."[2] The narrow issue presently before the Court is to identify, relative to May 15, 1973, the most recent binding contract between the parties.

The first contract between Taunton and Quincy Oil was signed on April 18, 1972. The second contract was dated April 23, 1973, and its close proximity to May 15, 1973 would suggest that it was the relevant "transaction" for base pricing under 10 C.F.R. § 212.93(a). Taunton argues, however, that by executing two change orders on May 1, 1973, and thus extending for three more months the terms of the 1972 contract, it exercised an option under the 1972 contract and completed formation of a separate "extension" contract. That contract, Taunton concludes, should be the benchmark for pricing under the regulations.

The key question is whether the following paragraph in the 1972 contract should be read as including a second subsidiary option contract or whether the right of extension should be viewed as one of several variable terms in a binding bilateral purchase agreement. The relevant portion of the 1972 contract reads as follows:

> The contractor [Quincy] agrees to deliver oil from May 1, 1972 to April 30, 1973 and, if required for a total of three (3) months beyond as herein before specified and in accordance with the reservations contained in the specifications of the bid proposal, the Commission designates _____ as the hauler authorized to deliver not less than fifty (50) per cent of the oil herein contracted for by transportation to

the Somerset Avenue and West Water Street Generating Stations, and the contractor and supplier agrees to the services and facilities of said hauler for said purpose.

■ In interpreting this contract the Court is mindful that it should review the agreement in its entirety, construe provisions with reference to one another where possible, and read the contract as "a rational business instrument which will effectuate the apparent intention of the parties." *Kagan v. Industrial Washing Machine Corp.*, 182 F.2d 139 (1st Cir. 1950); *Ucello v. Cosentino*, 354 Mass. 48, 235 N.E.2d 44 (1968). The Court notes that it is a familiar principle that "a construction which comports with the Agreement as a whole is to be preferred even if it be thought that certain language, viewed only by itself, more readily suggests something else." *Spartans Industries, Inc. v. John Pilling Shoe Co.*, 385 F.2d 495 (1st Cir. 1967). Having reviewed the terms of the agreement and examined Massachusetts law on option contracts and relevant portions of the Uniform Commercial Code, I rule that the contract at issue was a binding bilateral purchase agreement with some variable terms left in the unilateral discretion of the parties. Taunton's right of extension was one such term. The argument that Taunton was merely exercising its rights under a traditional option contract is not persuasive.

■ The language used in the contract does not clearly identify Taunton's right of extension as an option. The Massachusetts authorities which Taunton cites on option contracts deal mostly with the sale of real property and the contracts at issue in those cases contain quite definitive language that one of the parties had "the right and option

dollar-for-dollar basis, increased costs on the item.

**2.** The ruling in its entirety states:

[W]ith respect to sales of covered products made pursuant to a written variable-price contract, DOE is of the view that a transaction must be deemed to have occurred for purposes of the price regulations on the date when a binding contract was entered into between the

parties. The transaction price is the price lawfully charged pursuant to the terms of such contract in deliveries occurring on May 15, 1973 or on the most recent day preceding May 15, 1973. If no such deliveries occurred, the transaction price is the price that would have been charged under the terms of the contract had a sale occurred on the day the contract was entered into. . . .

to purchase" the property in dispute. *Atlantic Richfield Co. v. Couture et al.*, 4 Mass.App. 230, 344 N.E.2d 917 (1976); *The American Oil Company v. Maria Cherubini and Others*, 351 Mass. 581, 222 N.E.2d 892 (1967). It is often said that an option contract is most easily understood as a contract to keep an offer open. *Restatement, Second* § 24A (1964). It strains the reading of this contract to suggest that Taunton had a future right to accept an irrevocable offer from Quincy Oil for the delivery of oil from May through July of 1973. Taunton had the right of extension *ab initio*, at the time that the 1972 contract was signed in April of that year. This contract reads as one binding bilateral agreement. A separate and second unilateral option contract is not buried in the one qualifying phrase on which Taunton relies.

Taunton not only had the right to extend deliveries under the 1972 contract for three months, it had the right to designate the time, place, and amount of deliveries throughout the entire term of the contract. Taunton could even designate the hauler for fifty per cent of the oil that Quincy supplied. Price itself, of course, was the key variable term under the 1972 contract. The discretion accorded Taunton in all these other terms did not make the agreement any less bilateral or binding. So also Taunton's discretion on the three month extension did not convert a bilateral agreement into a unilateral option contract.

Taunton makes no effort to cite the Uniform Commercial Code. Some support for variable-term contracts can be found in Mass.Gen.Laws ch. 106 § 2–311(1).[3] Taunton's right of extension may be viewed as one of several particulars of performance left in the unilateral discretion of one party. There is no persuasive reason to conclude that the extension clause signals an irrevocable offer and a second contract within the primary agreement.

Taunton places considerable weight on two change orders signed by both parties between May 1 and May 9, 1973. The documents represent, Taunton claims, the acceptance of Quincy Oil's irrevocable offer of a three month extension under the alleged unilateral option contract. Taunton dismisses the significance of the purchase orders and concludes that the two change orders must be considered the most recent binding agreement between the parties prior to May 15, 1973.

The record does not support such a reading of the decisive documents in this case. They are clear on their face, and this Court finds no support for Taunton's strained interpretation. The two basic documents are of course the 1972 and 1973 contracts. Both agreements specify that Taunton will not be "liable for any materials furnished or used, nor for any work or labor done, unless said materials, work or labor are required of said contractor [Quincy Oil] on written order as required above" by Taunton. Taunton sent purchase order No. F–9551 to Quincy Oil on May 1, 1972 as a means of implementing the April 18, 1972 contract and meeting its demand for written orders. The purchase order explicitly states that it is being made "in complete accordance with the Agreement dated April 18, 1972." The second contract was signed on April 23, 1973, and purchase order No. G–0855, similar to purchase order No. F–9951 save for different prices and dates, followed on May 1, 1973. When Taunton exercised its right of extension this latter order had to be modified and that required use of two change orders.

Change order No. 1, issued on Taunton stationery under a May 1, 1973 date and signed by Quincy Oil on May 9, 1973, begins with the directive: "Gentlemen: The following changes apply to and become a part of purchase order No. G–0855." The change order then notes that deliveries under the 1973 contract are to be delayed until August 1, 1973. Change order No. 5 was also issued on May 1, 1973 and was specifi-

---

**3.** The provision reads:

(1) An agreement for sale which is otherwise sufficiently definite (subsection (3) of section 2–204) to be a contract is not made invalid by the fact that it leaves particulars of performance to be specified by one of the parties. Any such specification must be made in good faith and within limits set by commercial reasonableness.

cally incorporated in purchase order No. F–9951, the earlier order which had implemented the 1972 contract. That change order notified Quincy that Taunton was exercising its right of extension under the old contract. It specifically provided that deliveries were to continue until July 31, 1973 "as per our contract." The chain of documents, from the 1972 contract to purchase order No. F–9951 to change order No. 5, reinforces the conclusion that Taunton's exercise of the right of extension was the exercise of discretion under the old 1972 contract and not the formation of a second extension contract.

I rule that the relevant binding contract for "transaction" purposes under 10 C.F.R. § 212.93(a) and Ruling 1979–1 is the written variable–price contract signed by Quincy Oil and Taunton on April 23, 1973. Accordingly I rule that partial summary judgment should be entered for Quincy Oil in 78–2233–C, specifying that Quincy Oil did not willfully violate the Mandatory Petroleum Price Regulations, 10 C.F.R. Chapter II, provided it charged Taunton according to the April 23, 1973 contract during the period November 1, 1973 through May 31, 1976. Final summary judgment for defendant will follow within 30 days unless Taunton shows that a factual issue of pricing violation remains, even using the April 1973 contract as the determinative document.