**TAUNTON MUNICIPAL LIGHTING PLANT, Plaintiff-Appellant,**

v.

**DEPARTMENT OF ENERGY, et al., Defendants-Appellees.**

**TAUNTON MUNICIPAL LIGHTING PLANT, Plaintiff-Appellant,**

v.

**QUINCY OIL, INC., et al., Defendants-Appellees.**

Nos. 1–8, 1–9.

Temporary Emergency Court of Appeals.

Argued Oct. 29, 1981.

Decided Jan. 5, 1982.

Philip M. Cronin, Boston, Mass., with whom Roger D. Matthews and Catherine J. Norman, Withington, Cross, Park & Groden, Boston, Mass., and Edward A. Roster, Roster & Antine, Taunton, Mass., were on the brief for the appellant, Taunton Municipal Lighting Plant.

David S. Mortensen, Boston, Mass., with whom Timothy H. Gailey and Barbara L. Moore, Hale & Dorr, Boston, Mass., were on the brief for appellee, Quincy Oil, Inc.

Floyd I. Robinson, Washington, D. C., with whom David Engels, Dept. of Energy, Washington, D. C., and Edward F. Harrington, U. S. Atty. and Donald R. Anderson, Asst. U. S. Atty., Boston, Mass., were on the brief for the appellees, Dept. of Energy, et al.

Before GIGNOUX, MAXWELL and WEIGEL, JJ.

WEIGEL, Judge.

Before the Court are appeals from judgments of the United States District Court for the District of Massachusetts in two related cases involving application of the Mandatory Petroleum Price Regulations ("MPPR"), 10 C.F.R. § 212.91 *et seq.*, to the variable-price contracts between Taunton Municipal Lighting Plant ("Taunton") and Quincy Oil, Inc. ("Quincy"). 498 F.Supp. 396, 503 F.Supp. 235. In the first action, *Taunton Municipal Lighting Plant v. Department of Energy, et al.*, C–79–0829, the district court upheld the Department of Energy's ("DOE") withdrawal of a Remedial Order to Quincy and the validity of Ruling 1979–1. 44 *Fed.Reg.* 24046 (1979). In the second action, *Taunton Municipal Lighting Plant v. Quincy Oil, Inc., et al.*, C–78–2233, the district court held that the amount Quincy charged Taunton for oil was in compliance with the MPPR, 10 C.F.R. 212.93. The three principal issues on appeal are (1) whether Quincy violated the MPPR by calculating its maximum lawful selling price to Taunton based upon the price specified in the variable-price contract entered between

the parties on April 23, 1973; (2) whether Ruling 1979–1 was valid, and thus a proper ground for DOE's withdrawal of the Remedial Order to Quincy; and (3) whether the district court erred in restricting the filing of further papers pending the determination of summary judgment motions in each case.

*Background*

The factual background of the dispute between Taunton, Quincy, and DOE is fully set forth in earlier decisions. *See, Quincy Oil, Inc. v. Federal Energy Administration*, 468 F.Supp. 383 (D.Mass.1979), and 472 F.Supp. 1233 (D.Mass.1979), *aff'd*, 620 F.2d 890 (Em.App.1980); *Taunton Municipal Lighting Plant v. Department of Energy*, 472 F.Supp. 1231 (D.Mass.1979), *aff'd*, 620 F.2d 896 (Em.App.1980). The dispute centers on which is the proper base price—the price actually charged or the contract price—for calculating the maximum lawful selling price of oil by Quincy to Taunton.

The parties entered into two contracts for the supply of oil. The first was negotiated in April 1972, to run from May 1, 1972 through April 30, 1973, with an option for a ninety-day extension ("the 1972 contract").[1] The second was entered into on April 23, 1973, and was to run from May 1, 1973 through April 30, 1974 ("the 1973 contract").

In the fall of 1973, the MPPR were promulgated, establishing the maximum allowable price which a reseller of petroleum products could charge. The base price was to be calculated by reference to May 15, 1973. The price *charged* Taunton for oil on May 15, 1973, under the ninety-day extension of the 1972 contract, was $4.3196 per barrel. The price established in the 1973 *contract* was $4.8196 per barrel. In calculating its maximum lawful selling price, Quincy used the higher price established in the 1973 contract.

In 1976, the Federal Energy Administration ("FEA", predecessor of DOE) issued a Remedial Order against Quincy in which it claimed that Quincy had overcharged Taunton by basing its maximum selling price on the price specified in the 1973 contract, rather than the price actually charged for oil delivered on May 15, 1973, pursuant to the extended 1972 contract. The Remedial Order was affirmed on administrative review. The affirmance was predicated primarily on Ruling 1977–5, 42 *Fed.Reg.* 15302 (1977). Quincy sued for judicial review. While that action was pending, DOE issued Ruling 1979–1, which concluded, *inter alia*, that Ruling 1977–5 was erroneous in pertinent respects. DOE thereafter withdrew the Remedial Order. Quincy's action for judicial review of the Remedial Order was then dismissed for mootness and the dismissal was affirmed by this court. *Quincy Oil v. FEA, supra*, 620 F.2d 890.

During the pendency of that action, Taunton filed two suits: one against Quincy, alleging that it overcharged for oil, and another against DOE, alleging that it improperly withdrew the Remedial Order and invalidly issued Ruling 1979–1. Quincy filed a motion for partial summary judgment against Taunton in the first action; Taunton filed a motion for summary judgment against DOE in the second action. Finding that the motions amounted to cross motions "as a practical matter," the district court ordered that no additional papers be filed until the validity of Ruling 1979–1 was determined. The district court then ruled that Ruling 1977–5 was invalid, Ruling 1979–1 was valid, and granted Quincy's motion for summary judgment. The appeals now before us are from judgments dismissing both actions.

*Calculating Base Price Under the MPPR*

The basic rule for establishing the maximum allowable price which can be charged under the MPPR is found in 10 C.F.R. § 212.93(a):

> A seller may not charge a price for any item subject to this subpart which exceeds the weighted average price at orders on May 1, 1973.

---

1. Taunton exercised its right of extension under the 1972 contract by executing two change

which the item was lawfully priced by the seller in *transactions* with the class of purchaser concerned on May 15, 1973, plus an amount which reflects on a dollar-for-dollar basis, increased costs on the item. (Emphasis added.)

The critical term, then, for determining the appropriate base price under the regulations is "transaction"; it is this term which isolates and identifies the commercial events occurring on or most recently prior to May 15, 1973, in order to hold prices to levels established by the market at that time. The definition of "transaction" is contained in 10 C.F.R. § 212.31:

> Transaction means an arms-length sale or lease between unrelated persons which are not members of a controlled group (as defined in 26 U.S.C. 1563(a)) and is considered to occur at the time and place *when a binding contract is entered into between the parties.* (Emphasis added.)

Where no transaction occurred on May 15, 1973, with a particular class of purchaser, imputed price rules are used to determine a transaction price for that class. As stated in 10 C.F.R. § 212.93(d):

> ... If no transaction occurred on May 15, 1973, the most recent day preceding May 15, 1973, when a transaction occurred shall be used for purposes of applying the price rule.

Before turning to the rulings issued by FEA, and later DOE, purporting to clarify the proper meaning and application of the term "transaction," it is instructive to consider, first, the plain language of the regulations themselves. Under 10 C.F.R. § 212.31, a transaction occurs "at the time and place when a *binding contract* is entered into between the parties." (Emphasis added.) The reference is *not* to the time of actual delivery of oil, nor to the price actually charged on May 15, 1973. Rather, the reference is to the time of contracting. Thus, a contract entered into on May 15, 1973 (or on the most recent date prior to May 15, 1973), is the relevant "transaction" for determining the base price. To define transaction in this way is consistent with the purpose of the price control regulations,

*i.e.,* accurately to reflect market levels on, or near, May 15, 1973. As explained in Ruling 1977–5:

> ... the definition of 'transaction' as occurring at the time a binding contract is entered into also reflects an effort to exclude, insofar as possible, prices in shipments or deliveries of products which occurred on or before May 15, 1973, but which were made pursuant to old, fixed price contracts, and which were therefore not thought to be reasonably representative of May 15, 1973 market prices.

42 *Fed.Reg.* 15302.

It is also important to note that the *regulation* makes no distinction between fixed-price and variable-price contracts. Contrary to Taunton's argument that the definition of "transaction," as applied to sales of oil under variable-price contracts, is deemed to be the time that a definite price is fixed for a particular delivery, the regulation defines "transaction" only in terms of "when a binding contract is entered into." A variable-price is a "binding contract".

■ Thus the first step in determining the maximum lawful selling price is to ascertain the "time and place when a binding contract is entered". It is then necessary to identify, relative to May 15, 1973, the contract entered into between the parties on, or most recently prior to, May 15, 1973. Quincy identified the contract entered into on April 23, 1973, as the relevant contract for determining its maximum lawful selling price. Taunton argues that Quincy should have used the price charged on May 15, 1973, pursuant to the extended 1972 contract. We affirm the district court's holding that the relevant binding contract for "transaction" purposes under 10 C.F.R. § 212.93(a) is the variable-price contract signed by Quincy and Taunton on April 23, 1973.

The regulations clearly state that if no transaction occurred on May 15, 1973, *i.e.,* if no binding contract was entered into between the parties on that date, then "the most recent day preceding May 15, 1973, when a transaction occurred shall be used for purposes of applying the price rule." 10

C.F.R. § 212.93(d). Quincy and Taunton did not enter into a binding contract on May 15, 1973. The most recent day preceding May 15, 1973, on which they did was April 23, 1973. Thus, their contract of April 23, 1973, is the relevant benchmark for pricing under the regulations. There is no merit to Taunton's argument that the execution of two change orders on May 1, 1973, created a separate "binding contract" for pricing purposes.

### Validity of Ruling 1979–1

█ Rulings were issued in 1977 by FEA, and in 1979 by DOE, for the purpose of clarifying the definition of "transaction" as used in the MPPR. Ruling 1977–5 adopted a definition which differed depending upon whether a fixed-price or variable-price contract was at issue. Ruling 1979–1 declared that the same "contract-based" definition was applicable to both. The interpretation of Ruling 1979–1 is consistent with the language of the regulations and confirms the conclusion that the contract of April 23, 1973, is the relevant "transaction" for purposes of determining base price under the MPPR.

Ruling 1977–5 stated with respect to variable-price contracts that a transaction was deemed to occur "on the date the price becomes fixed with respect to a particular *delivery*." (Emphasis added.) Subsequently, Ruling 1979–1 was issued as a "modification" of Ruling 1977–5. In conformity with the language of the regulations, Ruling 1979–1 declared the view of DOE to be that a transaction occurred at the time a variable-price contract was entered into (*i.e.*, not at the times of each separate delivery under such a contract):

> [W]ith respect to sales of covered products made pursuant to a written variable-price contract, DOE is of the view that a transaction must be deemed to have occurred for purposes of the price regulations on the date when a binding contract was entered into between the parties. The transaction price is the price lawfully charged pursuant to the terms of such contract in deliveries occurring on May 15, 1973 or on the most recent day preceding May 15, 1973. *If no such deliveries occurred, the transaction price is the price that would have been charged under the terms of the contract had a sale occurred on the day the contract was entered into* . . . (emphasis added).

Taunton contends that Ruling 1979–1 is a "legislative" agency rule that had "substantial impact" on the industry and thus is invalid because it was issued without notice or opportunity to comment in violation of both the Administrative Procedure Act ("APA"), 5 U.S.C. § 553, and the DOE Organization Act, 42 U.S.C. § 7191. The district court was correct in rejecting Taunton's argument, and in upholding the validity of Ruling 1979–1.

Under 5 U.S.C. § 553(b)(3), an agency is required, in rule making, to publish "either the terms or substance of the proposed rule or a description of the subjects and issues involved." Under 5 U.S.C. § 553(c), an agency is required to "give interested persons an opportunity to participate in the rulemaking through submission of written data, views or arguments." These notice and comment requirements do not apply, however, to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A).

In addition to the APA requirements, the DOE Organization Act requires that "notice of any proposed rule, regulation, or order . . . shall be given by publication of such proposed rule, regulation, or order in the Federal Register. Such publication shall be accompanied by a statement of the research, analysis, and other available information in support of, the need for, and the probable effect of, any such proposed rule, regulation, or order." 42 U.S.C. § 7191(b)(1). However, these additional requirements are not triggered, and the provisions of the APA are adequate, if it is determined, with respect to a proposed rule, regulation, or order, that "no substantial issue of fact or law exists and that such rule, regulation, or order is unlikely to have a substantial impact on the Nation's economy or large numbers of individuals or businesses." 42 U.S.C. § 7191(c)(1).

Thus, a rule which is "interpretative" and unlikely to have a "substantial impact" can be issued without compliance with the notice and comment requirements of the APA and the DOE Organization Act.

An interpretative rule has been defined as "a clarification or explanation of existing laws or regulations rather than a substantive modification in or adoption of new regulations." *Continental Oil Co. v. Burns*, 317 F.Supp. 194, 197 (D.Del.1970). *Accord, Energy Consumers and Producers Association, Inc. v. DOE*, 632 F.2d 129, 139–42 (Em.App.1980).

As to Ruling 1979–1, we note as relevant that the ruling itself is characterized as an "interpretation" of DOE regulations. While the label attached by DOE is not controlling, it nevertheless is of weight in determining whether a ruling is legislative or interpretative. *Energy Reserves Group, Inc. v. DOE*, 589 F.2d 1082, 1092 (Em.App. 1978). More importantly, the definition of transaction in Ruling 1979–1 is virtually identical to that set forth in the regulations. Ruling 1979–1 provides ". . . a transaction must be deemed to have occurred for the purposes of the price regulations on the date when a binding contract was entered into between the parties." The regulations, 10 C.F.R. § 212.31, provide that a transaction "is considered to occur at the time and place when a binding contract is entered into between the parties." Consequently, although the definition of transaction admittedly has an impact on the economy and the industries regulated, the definition in Ruling 1979–1 could not cause a "palpable effect" or "substantial impact" apart from that caused by the regulations themselves. As stated in *UPG, Inc. v. Edwards*, 647 F.2d 147 (Em.App.1981),

> The law does not reject interpretations merely because there is a need for them; and the enforcement of almost all EPAA regulations as interpreted entails substantial financial consequences to oil companies, consumers, or others.

Ruling 1979–1 having made no substantive changes in the existing regulations, is an interpretative rule. As such, it is not subject to the notice and comment requirements of the APA and DOE Organization Act.

*Withdrawal of Remedial Order in light of Ruling 1979–1*

Taunton next argues that, even if Ruling 1979–1 is valid, it was arbitrary and capricious for DOE to withdraw the Remedial Order issued to Quincy for reconsideration in light of Ruling 1979–1. This court has previously affirmed the district court's holding that DOE had jurisdiction to withdraw the order. *Quincy Oil v. FEA, supra,* at 894. We now affirm the district court's holding that DOE acted properly in withdrawing the Remedial Order.

As detailed earlier, the Remedial Order was predicated on the erroneous interpretation of Ruling 1977–5, which stated that, with respect to variable-price contracts, the base price was to be determined by reference to the price at which deliveries were actually made on May 15, 1973. To the extent that Ruling 1977–5 failed to define transaction as occurring at the time a variable-price contract was entered, it was overruled. Thus, DOE correctly determined that the Remedial Order could not stand. Far from being arbitrary or capricious, the withdrawal of the Remedial Order was proper in light of the issuance of Ruling 1979–1. An administrative agency has the flexibility to modify an order which has not been unequivocally affirmed by a court of law. *United Gas Improvement Co. v. Callery Properties*, 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965); *Placid Oil Co. v. Federal Power Commission*, 483 F.2d 880, 904 (5th Cir. 1973), *aff'd*, 417 U.S. 283, 94 S.Ct. 2328, 41 L.Ed.2d 72 (1974). Contrary to Taunton's contention, it would be arbitrary to bind DOE to an erroneous interpretation and force it to prosecute a remedial order in violation of its own regulations and modified interpretative rulings. The Remedial Order was properly withdrawn.

*Restriction on Additional Filings In Opposition to Summary Judgment Motion*

Taunton's final argument is that the district court's failure to permit it to file docu-

ments in opposition to Quincy's motion for summary judgment deprived the court of jurisdiction to grant the motion. Taunton contends that the papers it submitted in support of its own motion for summary judgment against DOE cannot be treated as a cross-motion against Quincy.

Before turning to the propriety of the district court's order prohibiting further filings, it is helpful to look at the proceedings in context. The litigation between these parties has involved the filing of three separate civil actions, one of which has been affirmed by this court. *Quincy Oil v. FEA, supra,* 620 F.2d 890. The central dispute common to all these actions involves the interpretation of the manner in which base prices for the sale of oil are to be calculated under the MPPR. On May 20, 1980, following this court's affirmance of the dismissal of Quincy's action for judicial review and Taunton's appeal of an interlocutory order, Quincy moved for summary judgment against Taunton, on the ground that it was in compliance with the MPPR. Two days later, Taunton moved for summary judgment against DOE on the grounds that Ruling 1979–1 was invalid and that the Remedial Order was improperly withdrawn. Both such motions turned on the validity and interpretation of Ruling 1979–1. Expressly finding that there was no issue of material fact with respect to the question of the interpretation of Ruling 1979–1, and citing the pile of papers submitted by the parties which stood "twenty three inches high", the district court ordered that no more evidence be presented until the motions for summary judgment were ruled upon. After making the determination that Ruling 1979–1 was valid, the district court allowed additional briefing on the application of Ruling 1979–1 to the facts. After issuing a second memorandum regarding the application of the Ruling, the district court allowed Taunton thirty days to show that a factual issue remained before entering judgment.

■ We find that the procedures followed by the district court were more than adequate in assuring that Taunton had a full and fair opportunity to meet Quincy's arguments. There is an abundance of authority that a court can grant summary judgment against a moving party even if no cross motion is filed, if it is clear that no issue of fact exists. See, 6 Moore's *Federal Practice* 56–331–34. The important question is whether there is any genuine issue of material fact to be tried.

> Where, then, it is clear that there is no dispute as to the facts, which would justify judgment for one of the parties, the court may properly sustain his motion, . . . and, even in the absence of a formal motion, may grant summary judgment to a party when it is clear what the facts are and his adversary has had a fair opportunity to dispute them. (*Id.* at 56–348.)

■ This court has previously recognized that summary judgment on an issue of the interpretation of regulatory language is appropriate. *Standard Oil Co. v. Department of Energy,* 596 F.2d 1029, 1066 (Em.App. 1978). The parties had fully briefed the issue of the proper interpretation of the regulations, and there remained no material issue of fact. The decision on summary judgment turned on the meaning of the words in the regulations and rulings, and as such was a legal question properly decided by the district court.

The judgments of the United States District Court for the District of Massachusetts are affirmed.

SO ORDERED.