The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Malcolm Baldrige, Secretary of Commerce, Lionel H. Olmer, Undersecretary For International Trade Administration, United States Department of Commerce, Larry Brady, Assistant Secretary For International Trade Administration, United States Department of Commerce, Gary N. Horlick, Deputy Assistant Secretary For Import Administration, United States Department of Commerce, Leonard M. Shambon, Director, Office of Compliance, International Trade Administration, United States Department of Commerce, John Kugelman, Director, Antidumping Order Compliance Division, International Trade Administration, United States Department of Commerce, J. Linnea Bucher, Compliance Officer, Antidumping Order Compliance Division, International Trade Administration, United States Department of Commerce, Defendants,

and

NTN Bearing Corporation of America, Intervenor.

No. 82-6-00890.

United States Court of International Trade.

Feb. 20, 1986.

See also 553 F.Supp. 1060, and 569 F.Supp. 65.

Stewart & Stewart (Eugene L. Stewart, Terence P. Stewart, and James R. Cannon, Jr., Washington, D.C., on briefs), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Dept. of Justice, Civil Div., Commercial Litigation Branch, Washington, D.C. (Velta A. Melnbrencis, New York City, on briefs), for defendants.

Barnes, Richardson & Colburn (James H. Lundquist, Robert E. Burke, Donald J. Unger, and Thomas M. Keating, Chicago, Ill., on briefs) for intervenor.

*On Motions for Judgment on the Agency Record and for Remand*

TABLE OF CONTENTS

I. Background ............................... 1330
II. Res Judicata ........................... 1332
III. Agency Failure to Collect Necessary Data   1332

    A. The Impact of Freeport Minerals .....1332
        1. Exhaustion—Freeport Minerals ....1334
    B. Failure to Collect Data for Period Already Reviewed ...................1335

1. Necessity of Complete Home Market
   Data ...........................1336
2. Exhaustion—Incomplete Data .....1340
IV. Legal Issues Raised Below ...............1341

A. Deduction of Profit from ESP ........1341
   1. Standard of Review .............1342
   2. Agency Interpretation ...........1342
   3. Language of the Statute .........1343
   4. International Law ...............1345
   5. Non-absurdity of Results ........1347
B. Cost-value Relationship ..............1348

V. Conclusion ...........................1350

### Opinion and Order

MALETZ, Senior Judge:

In 1982, the International Trade Administration (ITA) of the Department of Commerce issued a final determination revoking a dumping finding on tapered roller bearings and component parts (TRBs) made in Japan by NTN Toyo Bearing Company (NTN) and distributed by NTN's subsidiary, NTN Bearing Corporation of America (NBCA). Plaintiff, The Timken Company (Timken), an American manufacturer of TRBs, commenced the present action challenging the ITA determination. Upon the government's motion, unopposed by Timken, the court, over intervenor NBCA's opposition, remanded several issues for further consideration by the ITA. The ITA's recalculation upon remand revealed only *de minimis* dumping margins. Presently before the court are two motions by Timken pursuant to rule 56.1 of this court seeking reversal of the agency revocation decision and remand for further proceedings. The government for its part agrees that partial remand is apropriate; NBCA, on the other hand, seeks affirmance of the ITA revocation determination. For the reasons set forth below, the court again remands this action to the ITA for (1) collection and review of data up to the date of its tentative determination; (2) collection and review of additional home market sales data for the period of time already reviewed by the ITA, and for reassessment of proper TRB model comparisons; (3) review of the accuracy of all pertinent NTN production costs; (4) correction of all errors that may have occurred below; and (5) recalculation of dumping margins and rescission of the partial revocation of the dumping finding, if warranted.

### I. *Background*

The dumping finding in question had been published by the United States Treasury Department on August 18, 1976. 41 Fed.Reg. 34,974. On November 14, 1979, Treasury published a notice of a tentative determination to modify or revoke the finding. 44 Fed.Reg. 65,690. That tentative determination was largely based upon information supplied to the Customs Service to the effect that there had been no sales at less than fair value between April 1, 1974 and March 31, 1978 of TRBs manufactured by NTN and sold by NBCA. *See id.* However, before Treasury had an opportunity to make a final determination regarding modification or revocation of the dumping finding, administration of the antidumping law was transferred from the Secretary of the Treasury to the Secretary of Commerce. Reorg.Plan No. 3 of 1979, § 5(a)(1)(C), 44 Fed.Reg. 69,273, *reprinted in* 19 U.S.C. at 963–64 (1982), *and in* 93 Stat. 1381, effective January 2, 1980, as provided by § 1–107(a) of Exec.Order No. 12,188, 45 Fed.Reg. 989, 993 (1980), *reprinted in* 19 U.S.C. at 968 (1982). Additionally, the Trade Agreements Act of 1979, which became effective on January 1, 1980, repealed the Antidumping Act of 1921 and replaced it with a new antidumping law. Trade Agreements Act of 1979, Pub.L. No. 96–39, tit. 1, § 106(a), 93 Stat. 144, 193.

Following transfer of administration to Commerce, the ITA conducted reviews of outstanding dumping findings pursuant to the annual review requirement of the Trade Agreements Act of 1979. *See* 19 U.S.C. § 1675 (1982), *amended by* 19 U.S.C.A. § 1675 (West Supp.1985). During review of the Treasury dumping finding on TRBs from Japan, the ITA reviewed production and sale of TRBs by NTN and NBCA for the period April 1, 1978 through November 14, 1979. On February 27, 1981, the ITA published a notice of preliminary results of administrative review and tentative determination to revoke in part the dumping finding, 46 Fed.Reg. 14,371, and

on June 15, 1982, it published a final determination revoking the outstanding dumping finding insofar as it pertained to TRBs produced and sold by NTN and NBCA, 47 Fed.Reg. 25,757. Timken challenged this final determination by commencing the present action on June 25, 1982.

In the course of this action, the government itself moved to remand the case to the ITA for recalculation of dumping margins. In support of this motion, which was agreed to by Timken and opposed by NBCA, the government advised the court that the ITA had taken the position that its method of calculating dumping margins had not been in accordance with its normal practice and was probably not in accordance with the applicable law and regulations. The court granted the motion for remand. *Timken Co. v. United States,* 7 CIT —, Slip Op. 84–63 (June 5, 1984). Thereafter, the government and Timken stipulated as to an order of remand, which was entered on June 26, 1984. Among other things, that order directed the ITA to recalculate dumping margins (1) using actual selling prices to the United States, (2) deducting an amount for United States import duties based on actual United States price, (3) weight-averaging home market prices on a monthly basis, and (4) using currency conversion factors applicable specifically to the date of exportation of the imported merchandise.

On February 5, 1985, the ITA submitted to the court the final results of its recalculation, which included a finding that the weighted-average dumping margin was 0.33%. Since the ITA considered this recomputed dumping margin to be *de minimis,* it did not rescind its partial revocation of the dumping finding.

Now before the court are two motions by Timken for partial judgment on the agency record. Timken's first motion requests that the case be remanded so that the ITA may (1) obtain from NTN a complete listing of its home market sales of TRBs during the period under investigation; (2) itself select from among NTN's home market sales the most appropriate "similar" mer-chandise for comparison with TRBs exported to the United States; (3) investigate and verify NTN's production cost figures for the period prior to March 21, 1978; (4) investigate and verify NTN's claimed adjustments for differences in merchandise; and (5) reject any partial submissions by NTN in response to investigation of the areas just identified and instead use the best information otherwise available.

Timken's second motion for partial judgment on the agency record alleges that the ITA erred in (1) revoking the antidumping duty order on the basis of an analysis of only a 19-month rather than a two-year period; (2) failing to deduct from exporter's sales price (ESP) an amount for reasonable profits; (3) adjusting foreign market value for certain advertising expenses and inland freight costs; (4) failing to investigate issues raised in a market-research report submitted by Timken; (5) deducting indirect selling expenses from foreign market value ("ESP offset"); (6) making deductions for differences in circumstances of sale in alleged contravention of a statutory requirement that there be a causal relationship between claimed differences in circumstances of sale and differences in value; and (7) failing to deduct from ESP selling expenses properly allocable to United States sales. Given these allegations of error, Timken seeks, in its second motion, a remand for recalculation of dumping margins, and reversal of the ITA's revocation of the dumping finding.

Supplementing its two motions for partial judgment, Timken has filed a brief arguing that the action should be remanded to the ITA on the additional ground that further review is required in light of the recent decision of the Court of Appeals for the Federal Circuit in *Freeport Minerals Co. v. United States,* 776 F.2d 1029 (Fed. Cir.1985).

The government disputes a number of the claims made by Timken, but agrees that the action should be remanded to the ITA a second time so that the agency may (1) determine NTN prices for all TRBs sold in the home market during the relevant

**1332**

time period; (2) consider whether the proper TRB models were compared; (3) review the accuracy of all pertinent NTN production costs; (4) decide whether adjustments of foreign market value for advertising expenses and inland freight costs were justified; and (5) recalculate dumping margins and rescind the partial revocation of the dumping finding, if appropriate.

NBCA opposes Timken's and the ITA's request for remand, contending, among other things, that the methods used by the ITA were lawful and that the final revocation determination was based on substantial evidence.

## II. *Res Judicata*

▐ NBCA also contends that a remand for reconsideration of the ITA determination is barred by the doctrine of administrative res judicata. The court does not agree. As the court noted in its decision ordering the first remand in this action, the law is clear that a remand is appropriate where an agency followed an improper method in making a determination or where there is a defect in the agency's findings. *See Timken Co. v. United States,* 7 CIT ——, Slip Op. 84–63 (June 5, 1984); *Ford Motor Co. v. NLRB,* 305 U.S. 364, 372–76, 59 S.Ct. 301, 306–08, 83 L.Ed. 221 (1939). It is true that res judicata principles may apply to administrative proceedings. *See United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 421–22, 86 S.Ct. 1545, 1559–60, 16 L.Ed.2d 642 (1966). However, administrative agency orders do not have the force and effect of law unless they have been "unequivocally affirmed by a court of law." *MGPC, Inc. v. Department of Energy,* 763 F.2d 422, 429 (Temp.Emer.Ct.App.), *cert. denied,* —— U.S. ——, 106 S.Ct. 76, 88 L.Ed.2d 62 (1985); *see Taunton Municipal Lighting Plant v. Department of Energy,* 669 F.2d

710, 715 (Temp.Emer.Ct.App.1982). Prior to such affirmation, "[a]n agency, like a court, can undo what is wrongfully done by virtue of its order," *United Gas Improvement Co. v. Callery Properties, Inc.,* 382 U.S. 223, 229, 86 S.Ct. 360, 364, 15 L.Ed.2d 284 (1965) (Federal Power Commission could order payment of refunds of excess monies collected under FPC order that had not become final and that had been overturned by a reviewing court); *Iowa Power & Light Co. v. United States,* 712 F.2d 1292, 1296–97 (8th Cir.1983), *cert. denied,* 466 U.S. 949, 104 S.Ct. 2150, 80 L.Ed.2d 536 (1984). Therefore, the ITA may reconsider its determinations when error taints the proceedings. *Melamine Chemicals, Inc. v. United States,* 8 CIT ——, ——, 592 F.Supp. 1338, 1339–40 (1984).

## III. *Agency Failure to Collect Necessary Data*

### A. *The Impact of Freeport Minerals*

▐ Timken requests that this action be remanded for further review in light of the recent decision in *Freeport Minerals Co. v. United States,* 776 F.2d 1029 (Fed.Cir. 1985). Both the government and NBCA oppose that request.[1]

▐ In *Freeport Minerals,* the court found that the ITA had abused its discretion in refusing a domestic party's request for collection of data for a period of time extending up to the date of the agency's tentative determination to revoke an antidumping order. The facts of *Freeport Minerals* and of this action are similar in many respects. In both cases the ITA inherited an action from the Treasury Department after Treasury had issued a tentative determination revoking an antidumping order, and then conducted a further review pursuant to the annual review requirement of section 751 of the Tariff Act

**1.** The issue of the applicability of the decision in *Freeport Minerals* to this action was not raised in Timken's complaint, which predated the decisions of this court and of the appellate court in that case. However, the parties have fully briefed the issue, and the court finds that the issue has been considered with the implied consent of all parties. Consequently, amendment

of the complaint is not required. U.S.Ct.Int'l Trade rule 15(c) (issues not raised by the pleadings that are tried by the express or implied consent of the parties shall be treated in all respects as if they had been raised in the pleadings); *cf. id.* rule 15(a) (leave to amend the pleadings shall be freely given when justice so requires).

of 1930, *as amended by* the Trade Agreements Act of 1979, 19 U.S.C. § 1675 (1982), *amended by* 19 U.S.C.A. § 1675 (West Supp.1985). Also in both cases, over a year had elapsed between the end of the period that was actually reviewed by the ITA and the date of the ITA's own tentative determination to revoke. Thus, in the present case, the ITA reviewed data only for a period extending to the time of *Treasury's* tentative determination, November 14, 1979. Despite this, the ITA's own tentative determination was not issued until February 27, 1981, approximately 16 months later, 46 Fed.Reg. 14,371; and its final determination was not issued until June 15, 1982, approximately two and one-half years after the end of the period that the ITA had reviewed, 47 Fed.Reg. 25,757. In contradistinction to the facts of *Freeport Minerals*, however, the domestic party in this action, Timken, did not request that the ITA obtain and review data updated to the time of the agency's tentative determination, although Timken now requests a remand for such review. Two questions are therefore before the court: (1) whether, under the reasoning of *Freeport Minerals*, the ITA abused its discretion in failing to review data updated to the time of its own tentative determination notwithstanding the absence of a request by a domestic party that it obtain such data, and (2) if so, whether the court should nonetheless decline to remand on the basis of *Freeport Minerals*, in view of Timken's failure to raise the issue below.

The Court of Appeals in *Freeport Minerals* held specifically that the ITA's refusal to comply with a domestic party's request for information updated to the time of the agency's preliminary determination placed an impermissible burden of proof upon the domestic party "contrary to the policies underlying the applicable statute and regulations," *id.* at 1033, and thus constituted an abuse of discretion. *Id.* at 1033–34. The ITA's failure here to obtain data updated to the time of its preliminary determination similarly constituted an abuse of discretion, despite the absence of a request for such data. That failure was equally contrary to the policies underlying the statutory and regulatory directives relied upon in *Freeport Minerals.*

The grant of discretionary authority to an agency "implies that the exercise of discretion be predicated upon a judgment anchored in the language and spirit of the relevant statutes and regulations." *Id.* at 1032. As stated in *Freeport Minerals*, the legislative history indicates a congressional intent that the administering agency, in reviews conducted under the 1979 Trade Agreements Act, "*always* use the most up-to-date information available." *Id.* (emphasis added); H.R.Rep. No. 317, 96th Cong., 1st Sess. 77 (1979) (H.R.Rep. No. 317).

The burden of ensuring such up-to-date review should not rest upon a domestic party. Antidumping proceedings are investigatory, not adjudicatory. H.R.Rep. No. 317 at 77; *see Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 3 CIT 191, 195, 542 F.Supp. 1020, 1025 (1982). The responsibility for making findings pursuant to section 1675 rests upon the ITA. *Freeport Minerals*, 776 F.2d at 1032. Thus, a request by a domestic party is not a precondition of the ITA's obligation to obtain updated information.

The government notes, though, that section 1675 was amended in October 1984, and that reviews under that section are now mandated only if a *request* for review has been received by the ITA. 19 U.S.C. § 1675(a)(1) (1982), *as amended,* 19 U.S.C.A. § 1675(a)(1) (West Supp.1985). The purpose of the amendment was to reduce the burden on the ITA "of automatically reviewing every outstanding order even though circumstances do not warrant it or parties to the case are satisfied with the existing order." H.R.Rep. No. 725, 98th Cong., 2d Sess. 22–23 (1984). However, that amendment was enacted several years after the ITA preliminary determination in this action. Whether the ITA abused its discretion is a determination that must be made not in light of the amendment, but in light of the law existing at the time of the

**1334**

alleged abuse. In sum, the court holds that the ITA abused its discretion in reaching a determination based on stale data.

1. *Exhaustion—Freeport Minerals*

■ Given the ITA's abuse of discretion in relying on stale data, the question remains as to whether the court should remand for further review in light of *Freeport Minerals* despite Timken's failure to exhaust its administrative remedies on this issue. "[A]s a general rule ... courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). However, unless exhaustion of administrative remedies is mandated by statute, application of the exhaustion doctrine is within the discretion of the court. *SEC v. G.C. George Securities, Inc.,* 637 F.2d 685, 688 n. 4 (9th Cir. 1981); *Association of National Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1157 (D.C. Cir.1979) (jurisprudential considerations such as the exhaustion doctrine do not bear on whether court has jurisdiction but only on whether it should exercise that jurisdiction), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980).[2] Like most other judicial doctrines, the doctrine of exhaustion is subject to numerous exceptions. *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969); *see Reid v. Engen,* 765 F.2d 1457, 1460–61 (9th Cir.1985). The doctrine "should not be applied where the obvious result would be a plain miscarriage of justice." *Hormel v. Helvering,* 312 U.S. 552, 558, 61 S.Ct. 719, 722, 85 L.Ed. 1037 (1941).

Among the exceptional cases are "those in which there have been judicial interpretations of existing law after decision below and pending appeal—interpretations which if applied might have materially altered the result." *Id.* at 558–59, 61 S.Ct. at 722 (footnote omitted); *see Philipp Brothers, Inc. v. United States,* 10 CIT —, —, 630 F.Supp. 1317 (1986); *Rhone Poulenc, S.A. v. United States,* 7 CIT —, —, 583 F.Supp. 607, 610 (1984). This is such a case. The interpretation of existing law set forth in *Freeport Minerals,* if applied in this action, could have a substantial impact upon the ITA's determination, since it would require review of data for an additional 16 months. Moreover, certain of the policies underlying the doctrine of exhaustion are not applicable to the present issue. For one thing, the question of what time period should have been reviewed by the ITA is one of law rather that one requiring analysis of a factual record; consequently, the court, in addressing the issue, does not usurp the fact-finding function of the agency. *See Railroad Yardmasters of America v. Harris,* 721 F.2d 1332, 1337–39 (D.C.Cir.1983) (appellate court would consider issue not raised before National Mediation Board or before district court where the substantive issue was one of law, did not require further factual development, and had been fully briefed). Furthermore, because the issue is one of law and because the decision in *Freeport Minerals* postdated the proceedings below, there is no danger that Timken intentionally refrained from raising this issue administratively in order to obtain some advantage by review on a sparse record. Timken has arguably been taken by surprise by the *Freeport Minerals* decision; remand is called for so that its interests may be protected by the review appropriate under the law. Accordingly, upon remand the ITA shall obtain and review data for a period terminating with the date of its preliminary determination.[3]

---

**2.** The relevant statute provides only that the Court of International Trade shall "where appropriate" require exhaustion of administrative remedies, and so *does not* create a jurisdictional bar to review of issues not raised below. 28 U.S.C. § 2637(d) (1982); *see Rhone Poulenc, S.A.*

*v. United States,* 7 CIT —, —, 583 F.Supp. 607, 611 (1984).

**3.** Timken has contended that the ITA also erred in reviewing data from only April 1978 to November 1979, a period of less than two years. In this connection, an agency regulation pro-

## B. *Failure to Collect Data for Period Already Reviewed*

Both the government and Timken ask this court for a remand to permit the ITA to obtain additional home market data for the period already reviewed; to investigate and verify cost of production data already on the record; and to reassess appropriate TRB model comparisons. NBCA argues against remand.

In its initial proceeding, the ITA reviewed data for the period from April 1, 1978 through November 14, 1979 to determine if there had been sales at less than fair value in that period. *See* 47 Fed.Reg. 25,757. During its review, the ITA used home market sales data that had been provided by NTN in response to Treasury Department questionnaires. Those questionnaires had requested not data on all home market sales of TRBs, but rather only data on sales of TRBs identical or "similar" to those sold for export to the United States. Thus, *NTN* made the initial determination of what constituted identical or similar TRB models, and provided home market data only as to those models. Also, NTN set forth the basis for its selection of similar models: the inside diameter, outside diameter, and width of the TRBs. The ITA accepted NTN's model comparisons and did not question the basis of the comparisons presented.

During the proceeding before the ITA that followed the initial remand by the court, Timken for the first time contested the appropriateness of NTN's assertions as to what constituted "similar" TRB models. It presented a specific analysis of TRB parameters, and argued that performance parameters as well as geometric parameters were relevant for proper model selection. The ITA believed that Timken had raised substantial questions as to the appropriateness of model comparisons. It

concluded, however, that the limited nature of the remand prevented it from requesting additional data from NTN, and found it could not address these model comparison questions in the absence of complete home market sales data. Also because of the absence of complete data, the ITA was not able to address other contentions made by Timken on remand as to the appropriateness of NTN's home market sales data selection although it believed that Timken's contentions cast doubt on the reliability of the sales information reported by NTN.

The data used by the ITA was not only incomplete in that it did not reflect home market sales of all TRB models, it was also incomplete in that it did not cover the entire time period that the agency should have reviewed under then existing law. Only on remand did the ITA realize that because there had been delays between the dates of export of TRBs and the dates of their resale in the United States, it should in the original proceeding have reviewed home market sales not only for the period beginning April 1, 1978, but also home market sales for an earlier period. Assuming for example that a TRB sold in the United States on April 1 had been exported to the United States four months earlier, the United States price of that TRB should have been compared with the value of an identical or similar TRB sold in the home market four months earlier. *See* 19 C.F.R. § 153.2(a) (1979); *cf.* 19 U.S.C. § 1677b(a)(1) (1982), *amended by* 19 U.S.C.A. § 1677b(a)(1) (West Supp.1985). In order to remedy its failure in the original proceeding to collect home market sales data for the earlier period, the ITA on the remand *added* to the administrative record home market sales data for the period from September 27, 1977 to March 20, 1978. That added data had earlier been provided to the Treasury Department in connection

vides that an application for revocation of an antidumping order will "[o]rdinarily ... be considered only if there have been no sales at less than fair value *for at least a two-year period* following the date of publication ... of an Antidumping Duty Finding...." 19 C.F.R. § 353.-54(b) (1985) (emphasis added). In view of the

court's determination that this action should be remanded for collection of additional data pursuant to *Freeport Minerals,* the issue of whether the ITA was obliged to review data for a two year period becomes moot since such a period will of necessity be reviewed upon remand.

with its review. However, Treasury had not verified the data and the ITA did not verify it either, viewing verification procedures as outside the scope of the remand.

The ITA also added to the record on remand data on production costs for the same period, September 27, 1977 to March 20, 1978, that had also been provided to Treasury in connection with its review, but that had never been verified. Timken questioned the reliability of the added data, but, again, although the ITA believed that Timken had raised significant questions, it did not verify the data. It did, however, use the data on remand both to calculate appropriate adjustments for differences in merchandise and to address new contentions by Timken that NTN had sold TRBs in the home market at less than the cost of production.[4]

The government now cites the incompleteness and lack of verification of the data used below, and the related issue of the appropriateness of model comparisons, as the basis for its request that the case be remanded a second time to permit the ITA to determine, among other things, (1) NTN prices for all TRBs sold in the home market during the relevant period, (2) whether the proper TRB models were compared, and (3) the accuracy of all pertinent NTN production costs. Timken concurs in this request for remand; NBCA opposes.

1. *Necessity of Complete Home Market Data*

■ The ITA abused its discretion in failing to collect the data necessary to ascertain the appropriateness of NTN's selection of similar TRB models. The issue of what constitutes proper model compari-

sons and the related issue of home market data selection go to the heart of the ITA's determination, concerning as they do the identity of the merchandise the ITA compared for the purpose of determining dumping margins. The basic task of the ITA in an action such as this is to compare the price of merchandise exported to the United States to the value of "such or similar merchandise" sold in the foreign market. *See* Antidumping Act of 1921, § 205(a), 19 U.S.C. § 164 (1976) (foreign market value is, among other things, the price at the time of exportation of merchandise to the United States at which "such or similar merchandise" is sold in the foreign market), *repealed by* the Trade Agreements Act of 1979, Pub.L. No. 96–39, tit. 1, § 106, 93 Stat. 144, 193.[5] Where identical merchandise was not sold in both the foreign market and in the United States, a determination as to which foreign market merchandise is "similar" to merchandise sold in the United States may be of great importance in a determination of whether there are dumping margins.

The statute defining "such or similar merchandise" sets forth three categories, or definitions, each of which describes increasingly dissimilar merchandise; the ITA must select merchandise from the first applicable category. Thus, pursuant to this statute, the ITA must select merchandise *identical* to that sold in the United States if it is available, 19 U.S.C. § 170a(3)(A) (1976); if that is not available, the ITA must select merchandise *like* the merchandise under consideration in materials and use, and approximately equal in value to the merchandise sold in the United States, *id.* § 170a(3)(B); only if that is not avail-

---

4. The ITA found that in fact NTN had in various periods sold TRBs in the home market at less than the cost of production. *See* 19 C.F.R. § 153.5 (1979); 19 C.F.R. § 353.7 (1985). This suggests the importance to the ITA's determination of the data added on remand, and hence the importance of verification.

5. Although the Antidumping Act of 1921, ch. 14, tit. II, 42 Stat. 11, was repealed by the Trade Agreements Act of 1979, which became effective on January 1, 1980, the substantive provisions

of the 1921 Act apply to unliquidated entries made prior to 1980. Moreover, the substance of the antidumping law under the 1979 Act is in large part identical to the law under the 1921 Act. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 48, 59 (1979) (relatively little change is made by the 1979 Act in the substantive provisions of the antidumping law). Hereinafter, references to sections of the Antidumping Act of 1921 will merely cite to the volume of the United States Code in which they formerly appeared.

able may the ITA select merchandise of the *same general class or kind* as the merchandise sold in the United States, and like that merchandise in its use, if the ITA determines that such merchandise may reasonably be used for comparison, *id.* § 170a(3)(C).

The statute does not make explicit whether, if two or more products fall within the definition of a given subsection of the statute, the ITA must determine which of those products is *most* similar to merchandise sold in the United States. However, such a requirement is implicit in the statutory scheme. The arrangement of definitions in the statute is such that the requirement that the ITA choose merchandise within the first applicable definition amounts to a requirement that it choose the most similar merchandise—at least insofar as the broad statutory definitions of "such or similar merchandise" are concerned. The spirit if not the letter of this requirement obligates the agency to also ascertain what constitutes the most similar merchandise from within a given definition. Thus, in *B.A. McKenzie & Co. v. United States,* 42 Cust.Ct. 718, 724 A.R.D. 103 (1959), *aff'd,* 47 CCPA 143, C.A.D. 748 (1960), the court observed that if values can be found both for "such" and for "similar" merchandise, the law requires that the value of "such" merchandise should be adopted because it more nearly represents the value of the merchandise under appraisement. Accordingly, the court held that, for the same reason, if values can be found only for items of "similar" merchandise, the value of the item *most* similar to that under appraisement should be adopted. Moreover, an interpretation of the statute requiring selection of the *most* similar merchandise is most likely to ensure that the ITA "makes the fair value comparison on a fair basis—comparing apples with apples," *Smith-Corona Group v. United States,* 713 F.2d 1568, 1578 (Fed. Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984).

The second definition set forth in the statute defines "such or similar merchandise" as:

Merchandise (i) produced in the same country and by the same person as the merchandise under consideration, (ii) like the merchandise under consideration in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise under consideration.

19 U.S.C. § 170a(3)(B) (1976). As described above, NTN provided to the ITA data on only that merchandise that NTN had *itself* determined to be identical or similar to merchandise sold in the United States. NTN asserts that this selected data established that the TRB models it was characterizing as "similar" met each of the requirements of similarity set forth in the statutory definition quoted above, and contends that the ITA therefore acted reasonably and upon substantial evidence in determining that those models were "similar" within the meaning of the statute.

The court assumes, without deciding, that the administrative record during the initial proceeding in this action contained substantial evidence supporting NTN's assertion that the merchandise it proposed as "similar" fell within the statutory definition. It does not follow, however, that there was substantial evidence that the proposed merchandise was the *most* similar merchandise of all the TRB models sold by NTN in the home market, including TRBs as to which no data had been provided. Moreover, even an ITA determination that is supported by substantial evidence may be overturned if it is otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B) (1982); *see Chapman v. Donovan,* 9 CIT —, —, Slip Op. 85–113, at 4 (Oct. 25, 1985) (in addition to the requirement of substantial evidence there is the further requirement that rulings be in accordance with statute and that there be a showing of reasoned analysis); *cf. Trans-American Van Service, Inc. v. United States,* 421 F.Supp. 308, 316 (N.D. Tex.1976) (an agency's finding may reflect arbitrary and capricious action even though supported by substantial evidence). In certain cases, an agency's failure to collect

pertinent data or to consider a relevant aspect of an issue, constitutes an abuse of discretion. *Kelly v. Secretary of United States Department of Labor*, 9 CIT ——, ——, Slip Op. 85–132, at 7–8 (Dec. 30, 1985) (failure of OTAA, in determining eligibility of employees for trade adjustment assistance, to collect or consider data from company that accounted for the largest decline in orders for the product in question meant that the agency's methodology was not in accordance with law); *Rutherford v. United States*, 438 F.Supp. 1287, 1291 (W.D. Okla.1977) (to act without collecting the necessary facts is an abuse of discretion), *aff'd*, 582 F.2d 1234 (10th Cir.1978), *rev'd on other grounds*, 442 U.S. 544, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979); *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (abuse of discretion for agency to fail to examine relevant data); *cf. Natural Resources Defense Council, Inc. v. NRC*, 547 F.2d 633, 646 (D.C.Cir.1976) (agency may abuse its discretion by a decision that the record will not sustain in the sense that it raises fundamental questions for which the agency has adduced no reasoned answers), *rev'd on other grounds sub nom. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

By failing to collect home market sales data on TRB models other than those characterized by NTN as similar or identical, the ITA abdicated to NTN its statutory responsibility for determining what TRB models produced by NTN were the *most* similar to models sold in the United States. As the ITA now acknowledges, it cannot, using the selected data available to it, determine whether there exist home market TRB models that would have been more appropriate for purposes of comparison than were the models selected by NTN.

It is of particular importance that the administering agency itself make the required determination of what constitutes most similar merchandise, rather than delegating that responsibility to an interested party, considering that the issue may be a complex one on which reasonable minds could differ. For example, of two potentially "similar" foreign market products, one product could be most similar to merchandise sold in the United States in its use, while the other might be more similar in its materials. It is the administering agency rather than an interested party that should make the determination as to what "similar" characteristics are of the most significance. Additionally, it is hard to imagine that a foreign manufacturer, given the option of selecting what constitutes similar merchandise, and assuming that there exists more than one product from which such a choice can be made, would not make the choice of merchandise most advantageous to itself.[6]

If, for example, there were two foreign market products that could be considered "similar" but which differed in value, a foreign manufacturer would have an incentive to select as "similar" the product that was of lower value, as such selection could result in lower margins. Congress could not have intended that an interested party be accorded so much control over a determination of such importance. Indeed, by accepting a foreign manufacturer's assertions as to what constitutes most similar merchandise without obtaining the complete data needed to determine the appropriateness of those assertions, the ITA in this action violated the spirit of the statutory requirement that it verify the data relied upon in proceedings involving revocation of antidumping orders. *See Al Tech Specialty Steel Corp. v. United States*, 745 F.2d 632, 634 (Fed.Cir.1984); 19 U.S.C.

---

**6.** The court is in no way indicating that NTN has acted in bad faith in its production of data. NTN was asked to provide information only on those models that NTN determined were identical or similar; the court concludes not that NTN erred in producing incomplete home market sales data, but rather that the ITA erred as a matter of law in not requesting complete data where that data was necessary.

§ 1677e(a) (1982), *as amended,* Pub.L. No. 98–573, tit. VI, § 618, 98 Stat. 3037 (1984), *reprinted in* 19 U.S.C.A. § 1677(a) (West Supp.1985); H.R.Rep. No. 725, 98th Cong., 2d Sess. 42–43 (1984) (the Committee on Ways and Means believes it is essential that whenever the ITA revokes an anti-dumping duty order, the interests of domestic industry be protected by full verification of the information relied upon in making that determination). What is more, the failure to collect complete data deprived Timken of information essential to the assertion of its rights. *See Freeport Minerals,* 776 F.2d at 1033 (Congress intended that the ITA provide the maximum availability of information to an interested party because access to information is imperative for offensive assertion of its rights).

■ NBCA contends, however, that the government, by its present request for a remand to permit the ITA to obtain complete home market data and to reassess model comparisons, is attempting to apply a new policy not in effect at the time of the ITA's original determination. *See American Trucking Associations, Inc. v. Frisco Transportation Co.,* 358 U.S. 133, 146, 79 S.Ct. 170, 177–78, 3 L.Ed.2d 172 (1958) (agency power to correct ministerial errors may not be used as guise for changing previous decisions because the wisdom of those decisions appears doubtful in light of changing policies); *Upjohn Co. v. Pennsylvania Railroad,* 381 F.2d 4, 5 (6th Cir. 1967) (agency may not apply new policy retroactively to a proceeding concluded three years previously). The ITA apparently has a current practice of obtaining complete home market sales data and itself determining what constitutes most similar merchandise. *See generally Bicycle Speedometers From Japan; Final Results of Administrative Review of Anti-*

*dumping Finding,* 47 Fed.Reg. 28,978, 28,-980 (1982); *Stainless Clad Steel Plate From Japan: Preliminary Determination of Sales at Less Than Fair Value and Suspension of Liquidation,* 47 Fed. Reg. 12,200 (1982). But here, the government, in seeking remand on this issue, is not attempting to substitute use of a current ITA policy for use of an earlier, reasonable policy. Rather, the method *originally* used in this action by the ITA to fulfill its statutory obligation to determine the value of merchandise most similar to that sold in the United States—*i.e.,* collection of data so incomplete that the ITA could not in fact determine what constituted most similar merchandise—was unreasonable and an abuse of discretion.

■ The ITA also abused its discretion by failing in the initial proceeding to obtain *any* data for a substantial period of time relevant to its determination, *i.e.,* the data from September 1977 to March 1978. *See supra* pp. 1335–36. The government has presented no explanation for the ITA's failure to collect that data, which was necessary for the performance of significant statutorily mandated calculations. Nor was that error sufficiently remedied on remand, for while the ITA did on remand add the necessary data to the record, that data was never verified.

These errors in data collection and model selection go to the heart of the ITA's determination. In addition, the government acknowledges a number of other errors in the proceedings below. For example, it agrees with Timken that there is a lack of evidence on the administrative record to support the ITA's determinations regarding adjustments to foreign market value for advertising and inland freight expenses, and regarding certain deductions from ESP for administrative salaries and warehouse expenses.[7] Moreover, the first remand re-

---

**7.** With regard to advertising, the ITA deducted certain advertising costs as representing differences in circumstances of sale, yet the administrative record reveals evidence of only corporate image or of general product line advertising rather than of advertising directly related to the TRB sales under consideration or attributa-

ble to later sales of those TRBs by a purchaser. This was contrary to agency regulation. *See* 19 C.F.R. § 153.10 (1979); 19 C.F.R. § 353.15 (1981); *Carlisle Tire & Rubber Co. v. United States,* 3 CIT 163, 167–68 (1982); *Brother Industries, Ltd. v. United States,* 3 CIT 125, 151, 540 F.Supp. 1341, 1365 (1982), *aff'd sub nom. Smith-*

sulted from the government's and ITA's assertion that the ITA had failed to adhere to statutory requirements and to its own precedent regarding the methodology used in a number of other significant calculations. As the government itself suggests, the nature and number of the errors that marred the proceedings below call into question the very integrity of the ITA's determination.

The errors committed below—and particularly those in data and model selection, as well as the ITA's error under *Freeport Minerals* —cannot be remedied by addressing each in isolation. For these errors affect the entirety of the data base thus far used by the ITA. The vice of a poor data base is that it taints even good methodology. Thus, even if the ITA used appropriate methodology below, its computations were necessarily flawed, if the data base was fundamentally inadequate. A remand order that fails to direct a review of *all* ITA calculations will therefore risk a final determination containing error and internal inconsistency. Hence, a remand for all purposes is appropriate. *See Tenneco Oil Co. v. Department of Energy,* 475 F.Supp. 299, 309 (D.Del.1979) (court would consider a claim not raised below where to do otherwise would create the anomaly of requiring the reviewing court, or the administrative agency on remand, to apply an arguably erroneous standard in deciding those claims that had been properly raised); *cf. Ford Motor Co. v. NLRB,* 305 U.S. 364, 372, 59 S.Ct. 301, 306, 83 L.Ed. 221 (1939) (circuit court acted properly in remanding action to NLRB for reconsideration of entire case).

2. *Exhaustion—Incomplete Data*

■ A remand is appropriate even though Timken, in the initial proceeding before the ITA, failed to raise a number of the contentions raised in this action, includ-

ing those involving the ITA's failure to obtain complete data and to determine what constituted most similar merchandise. As discussed above, application of the doctrine of exhaustion of administrative remedies is within the discretion of the court. "Whenever a question concerning administrative, or judicial, reconsideration arises, two opposing policies immediately demand recognition: the desirability of finality, on the one hand, and the public interest in reaching what, ultimately, appears to be the right result on the other." *CAB v. Delta Air Lines, Inc.,* 367 U.S. 316, 321, 81 S.Ct. 1611, 1617, 6 L.Ed.2d 869 (1961) (footnote omitted); *cf.* 4 K. Davis, Administrative Law Treatise § 26:2, at 420–21 (2d ed. 1983) (courts should consider the merits in deciding exhaustion issues and should acknowledge that they do so); *see also Hormel v. Helvering,* 312 U.S. at 558, 61 S.Ct. at 722 (Court stated that implication of an earlier case was that unexhausted issue would have been remanded had the newly raised issue been of sufficient merit).

The gravity of the errors in this action, when considered with the fact that the government itself is requesting a remand and representing that the ITA's errors call into question the integrity of its determination, suggests that in this action, "the public interest in reaching what ultimately appears to be the right result" outweighs the desirability of finality. Then too, since the government itself is asking for a remand despite Timken's failure to exhaust its remedies, the significance of one of the policies underlying the exhaustion doctrine, namely, that a court should not usurp an agency's function by considering issues the agency has not first considered, is of reduced significance. *See McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969) (notions of administrative autonomy require that the

*Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Regarding inland freight costs, the ITA now states that certain freight costs for the transportation of TRBs from a manufacturing plant to a distribution center were improperly allowed as costs of

differences in circumstances of sale because those costs represented a general overhead expense rather than an expense directly related to the sales under consideration. *See* 19 C.F.R. § 153.10(a) (1979); 19 C.F.R. § 353.15(a) (1985).

agency be given a chance to discover and correct its own errors). *Cf. Mathews v. Eldridge,* 424 U.S. 319, 326–28, 96 S.Ct. 893, 898–99, 47 L.Ed.2d 18 (1976) (Secretary of HEW may waive exhaustion requirement regarding the necessity of a final administrative decision).

Also relevant is the ITA's explanation that its errors in data collection and model selection arose from the transitional nature of this case, which was inherited from the Treasury Department. These errors thus resulted from a violation of a significant public policy, namely, that the ITA should provide the same quality of review in all cases, regardless of whether it handled the cases from their inception. *See Freeport Minerals,* 776 F.2d at 1033–34; *Board of Public Instruction v. Finch,* 414 F.2d 1068, 1073 (5th Cir.1969) (court would disregard failure to exhaust remedies where, *inter alia,* agency action was contrary to a public policy extending beyond the rights of the individual litigants).

A number of the policy considerations underlying the exhaustion doctrine are pertinent here, including the consideration of fairness to litigants and the fact that litigants should not be encouraged to delay raising claims. *See McKart v. United States,* 395 U.S. at 195, 89 S.Ct. at 1663 (one reason for exhaustion doctrine is that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its administrative procedures). The court is also aware that NTN and NBCA may incur substantial cost and inconvenience as a result of a second remand. It is also aware that Timken could and should have raised its concerns as to the completeness of home market sales data and as to model similarity during the original proceeding before the ITA. Despite these concerns, however, the court, for the reasons set forth above, finds on balance that the interests of justice require a remand.

### IV. *Legal Issues Raised Below*

During this action, Timken has raised two legal issues that it also raised below,

first, the issue of whether the statute governing calculation of exporter's sales price (ESP) requires a deduction of a subsidiary's profit, and, second, the issue of the type of evidence needed to establish a relationship between cost and value, in the context of calculations concerning differences in circumstances of sale. These issues are addressed below.

### A. *Deduction of Profit From ESP*

Timken contends that in calculating the exporter's sales price of TRBs produced by NTN and sold by NBCA in the United States, the ITA should have deducted any profits earned by NBCA.

Under the Antidumping Act of 1921, the United States price of imported merchandise must be compared with the foreign market value of identical or similar merchandise to determine whether there were sales in the United States at less than fair value. When imported merchandise is initially sold to an *unrelated* purchaser in the United States, "purchase price"—the price paid by the purchaser minus various deductions specified by statute—is used as the United States price. Antidumping Act of 1921, § 203, 19 U.S.C. § 162 (1976). However, when, as in this case, the merchandise is first sold to a *related* purchaser in the United States, *e.g.,* to a subsidiary of the exporter, "exporter's sales price" is used as the United States price. ESP is the price at which the merchandise is subsequently sold by the related party in an arm's length transaction, minus deductions specified in section 204 of the 1921 Act. 19 U.S.C. § 163 (1976).

One of the deductions from ESP required by section 204 is "the amount of the *commissions,* if any, for selling in the United States the particular merchandise under consideration" (emphasis added). The ITA in this action interpreted the word "commissions" literally, taking the position that "[t]here is no statutory provision for a deduction from the ESP of a U.S. subsidiary's profit." 47 Fed.Reg. at 25,758. It therefore deducted from ESP commissions paid out by NBCA to its selling agents, but

refused to deduct *profits* earned by NBCA on resale of the imported merchandise. Timken claims that this was error, contending that the term "commissions," as understood when the 1921 Act became law, encompasses a subsidiary's profits.

### 1. Standard of Review

■ The interpretation of a statute by the agency entrusted with its administration is entitled to weight, especially where that interpretation represents longstanding administrative practice. *See Zenith Radio Corp. v. United States*, 437 U.S. 443, 450, 98 S.Ct. 2441, 2445, 57 L.Ed.2d 337 (1978); *Ambassador Division of Florsheim Shoe v. United States*, 748 F.2d 1560, 1563 (Fed. Cir.1984); *Smith-Corona Group v. United States*, 713 F.2d 1568, 1576–77, 1579 (Fed. Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 232, 564 F.Supp. 834, 837 (1983). An agency's interpretation of a statute it administers need only be reasonable; there is no requirement that it be the only possible interpretation. *Asahi Chemical Industry Co. v. United States*, 4 CIT 120, 123, 548 F.Supp. 1261, 1264 (1982); *see Train v. Natural Resources Defense Council, Inc.*, 421 U.S. 60, 75, 87, 95 S.Ct. 1470, 1485–86, 43 L.Ed.2d 731 (1975); *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 153–54, 67 S.Ct. 245, 250–51, 91 L.Ed. 136 (1946).

Moreover, if the language of a statute is clear and unambiguous, that language must ordinarily be regarded as conclusive, absent clearly expressed legislative intent to the contrary. *See Bread Political Action Committee v. Federal Election Commission*, 455 U.S. 577, 580, 102 S.Ct. 1235, 1237–38, 71 L.Ed.2d 432 (1982); *Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, —— U.S. ——, ——, 106 S.Ct. 681, 685–86, 688–89, 88 L.Ed.2d 691 (1986) (courts must give effect to the unambiguously expressed intent of Congress; application of the "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address). Courts may in rare cases override the literal terms of a statute where application of those terms would lead to an absurd result. *Crooks v. Harrelson*, 282 U.S. 55, 59–60, 51 S.Ct. 49, 50–51, 75 L.Ed.2d 156 (1930).

■ Against this background, the court finds, for the reasons that follow, that the ITA's interpretation of the word "commissions" to mean only commissions—and not profits—represents longstanding administrative practice; that the meaning of the term "commissions" is clear; that there is no basis in legislative history or in the terminology in use at the time of passage of the Antidumping Act for disregarding that meaning; and that adherence to the clear meaning of the word "commissions" does not create an absurd result. The ITA's interpretation is therefore upheld.

### 2. Agency Interpretation

During oral argument, the government indicated to the court that the ITA's interpretation of the word "commissions" represents longstanding administrative practice. Timken has not brought to the court's attention any decisions to the contrary. Beyond that, various documents suggest that the ITA's position indeed represents a long-term practice with its inception in the Treasury Department, the previous administering agency.

Specifically, two bills have in the past been introduced that would, among other things, have modified section 204 to require deduction of "the amount of commissions *and profits*" from ESP. S. 1726, 90th Cong., 1st Sess., § 3 (1967) (bill introduced by Sen. Hartke); S. 3606, 87th Cong., 2d Sess., § 3(b) (1962) (bill introduced by Sen. Humphrey) (emphasis added). It would appear that these attempts to add a deduction for profits were made because the administering agency was in fact *not* deducting profit from ESP.

Additionally, a 1979 report by the Comptroller General indicates that section 204 has been understood literally. U.S. General Accounting Office, *U.S. Administration*

*of the Antidumping Act of 1921; Report to the Congress of the United States by the Comptroller General of the United States*, ID–79–15, at 24–27 (Mar. 15, 1979). Although the report does not directly address the issue here raised, a sample ESP calculation contained in the report is illuminating. ESP as calculated in the report includes the profits made by a United States affiliate; deducted from that ESP are selling expenses, transportation, and duties—but *not* the affiliate's profit. *Id.* This sample calculation ostensibly represented Treasury Department practice. *See also* Hemmendinger & Barringer, *The Defense of Antidumping and Countervailing Duty Investigations Under the Trade Agreements Act of 1979*, 6 N.C.J. Int'l L. & Com.Reg. 427, 433–34 (1981) (for the foreign manufacturer, ESP "often is a more favorable basis of calculating fair value because, unlike purchase price, the profit of the U.S. importer is included in the net adjusted price, resulting in a higher United States price").

In light of the ITA's representation to this court and considering the above cited materials, the court finds that the ITA's interpretation of the word "commissions" in section 204 represents longstanding practice.

### 3. *Language of the Statute*

The literal language of section 204, calling for the deduction of "the amount of the commissions, if any, for selling in the United States the particular merchandise under consideration," on its face clearly calls for the deduction of commissions, and just as clearly does not call for the deduction of profits. There is no basis in common language usage for a claim that the profit earned by a subsidiary or other related party upon the sale of goods originally purchased from a parent company constitutes a "commission" to that party. A commission is commonly understood to be an allowance or percentage given to an agent for transacting business for another. *See* Funk & Wagnalls New Standard Dictionary of the English Language 537

(I.Funk ed. 1942); 1 J. Bouvier, Law Dictionary and Concise Encyclopedia 548 (F. Rawle 3d rev. 1914). "Profit," by contrast, is the excess of a selling price over an original cost. *See* Funk and Wagnalls New Standard Dictionary of the English Language 1979 (I. Funk ed. 1942); 3 J. Bouvier, Law Dictionary and Concise Encyclopedia 2737 (F. Rawle 3d rev. 1914).

Timken argues, however, that at the time of passage of the 1921 Act, the word "commission" was a Customs Service term of art denoting generally *any* profit accruing to a related importer as a consequence of the sale of imported goods. In the case of an agent selling on consignment, that profit, according to Timken, generally would accrue in the form of a commission (in the usual sense of that word), but in cases involving other related parties, that benefit might accrue in the form of profit upon sale of the goods in the United States. Under this reading of "commissions," the ITA should deduct from ESP not only commissions *paid* by a United States subsidiary to its selling agents, but also "commissions" *earned* by a United States subsidiary in the form of profits from a resale of imported merchandise.

In support of this argument regarding Customs Service use of the term "commissions," Timken relies primarily upon colloquy before the Senate Finance Committee in 1921 between Senator McCumber and a special agent for the Customs Service, George Davis. In that colloquy, Mr. Davis explained the methodology used in arriving at ESP under the bill that became the 1921 Act. On two occasions, he seemed to identify "commission" with "profit."

> *Mr. Davis. . . .* For instance, there is an agent in this country who sells merchandise in Kansas City for dollars and cents, including duty, ocean freight, the expense of getting it from New York to Kansas City, *and the agent's commission, or his profit.* This order is transmitted to the foreign manufacturer. He knows the merchandise is going to Kansas City. It may come forward on a consigned invoice, consigned to the agent

himself, and the Government does not know anything about the sales price to Kansas City. Such price is the foreign exporter's sales price and that should be distinguished from the open purchase price paid by the bona fide American importer who buys direct from the manufacturer. There might be dumping in either instance, but the two prices should be distinguished.

 *Senator McCumber.* Where there is no difference in the price, how would you determine which one to follow?

 *Mr. Davis.* We would have to subtract from the price in Kansas City the expense of bringing it from foreign markets to Kansas City, the duty, *the foreign agent's commission, or profit,* and the net amount, is the amount that goes back to the other side becomes the exporter's sales price.

S.Comm. on Finance, *Emergency Tariff and Antidumping: Hearing on H.R. 2435,* 67th Cong., 1st Sess. 42–43 (1921) (emphasis added).

Timken does not argue that Mr. Davis, in the above colloquy, actually had in mind the profits earned by a subsidiary of a foreign exporter. It rather argues that Mr. Davis was explaining the general concept involved, namely, that what is deducted from ESP is the benefit accruing to the related party selling in the United States—whether in the form of a paid commission or other profit. While Timken's reading is plausible, an equally plausible reading of Mr. Davis's remarks is to understand his reference to "commission, or profit" as merely reflecting the fact that a commission received by an agent will generally represent a profit to that agent—a fact that does not necessitate a conclusion that profit in any form that is earned by resale of goods by a subsidiary corporation must therefore be characterized as a "commission." Furthermore, "[r]eliance on such isolated fragments of legislative history in divining the intent of Congress is an exercise fraught with hazards, and 'a step to be taken cautiously.'" *New England Power Co. v. New Hampshire,* 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982)

(quoting *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 26, 97 S.Ct. 926, 941–42, 51 L.Ed.2d 124 (1977)); *see Garcia v. United States,* —— U.S. ——, ——, 105 S.Ct. 479, 484, 83 L.Ed.2d 472 (1984) (isolated statement on floor of House not impressive legislative history); *United States v. Taylor,* 752 F.2d 757, 764 (1st Cir.), *jurisdiction postponed to hearing on merits sub nom. Maine v. Taylor,* —— U.S. ——, 106 S.Ct. 307, 88 L.Ed.2d 284 (1985).

Withal, Timken claims to find further support for a reading of the term "commission" to include profits, whether earned via commission or otherwise, in the unusually broad meaning ascribed to the word "consignment" under the Tariff Act of 1913, which was in effect at the time of passage of the 1921 Antidumping Act. *See J.H. Cottman & Co. v. United States,* 20 CCPA 344, 354–56, 359, T.D. 46,114 (1932) (court looks to meaning of terms in customs valuations law in construing similar language in antidumping law), *cert. denied,* 289 U.S. 750, 53 S.Ct. 695, 77 L.Ed. 1495 (1933); R. Sturm, Customs Law and Administration § 47.5, at 366 (2d ed. 1980). Specifically, Timken cites a section of the Tariff Act that provided for the calculation of a United States value by taking a United States sale price and deducting from it certain items including "a *commission* not exceeding 6 per centum if any has been paid or contracted to be paid on *consigned* goods...." Tariff Act of 1913, ch. 16, § III, para. L, 38 Stat. 114, 186 (emphasis added). This provision somewhat resembles the provision of section 204 for the calculation of ESP by deduction of commissions from a United States price.

Timken points out that the language in the 1913 Tariff Act section regarding goods "consigned" for sale was understood to refer to goods imported by a related party for sale in the United States, even if the goods in question were not being consigned from a principal to an *agent.* Thus, in *United States v. Johnson Co.,* 9 Ct.Cust. App. 258, 266–68, T.D. 38,215 (1919), goods sent from a factory abroad that was owned by the party importing the goods were

deemed "consigned." Timken's argument seems to be that because the term "consign" thus has a broader meaning under the Tariff Act of 1913 than it does in common parlance, then the word "commission" —which is often used in conjunction with the word "consignment," as the term denoting the benefit accruing to the party receiving consigned goods—also has a broader meaning, and hence encompasses the concept of any profit earned by a related party "consignee." The difficulty is that Timken fails to provide any direct support for this proposition. Therefore, its argument that in Customs Service terminology of 1921, the clear meaning of the word "commissions" *was* "commissions or profits," is insufficiently established.

There is an additional reason for rejecting Timken's argument. Timken does not contend that whatever profits are claimed by a subsidiary should be deducted from ESP, but rather maintains that *"reasonable* profits" should be deducted from ESP. Deduction of "reasonable" profits is advocated to avoid an alleged danger that a related exporter and importer could manipulate profits so as to obtain maximum benefit from an ESP calculation. There is nothing in legislative history to indicate a congressional intent that "reasonable" profits be deducted. Further, Congress knew how to provide for the deduction of only reasonable commissions or profit when it wished to do so. Thus, the 1913 Tariff Act section discussed above included a "lid" on the amount of commissions and profits that could be deducted from the United States price. That "lid" provided that commissions not exceeding six per cent could be deducted when goods were consigned and that profit not exceeding eight percent could be deducted when goods were purchased. Tariff Act of 1913, ch. 16, § III, para. L, 38 Stat. 114, 186.[8]

The absence of similar specificity as to a percentage amount of commissions that may be deducted from ESP under section 204 suggests that Congress did not intend to limit the deductions for "commissions" to only "reasonable commissions" and that Timken's reading of "commissions" as "commissions and *reasonable* profits" is unduly creative.

### 4. *International Law*

■ Timken cites a provision of the International Antidumping Code as further evidence that section 204's reference to "commissions" should be understood as a reference to "commissions and profits." The International Antidumping Code is a multilateral agreement signed by the United States in 1979 in the course of the Tokyo Round of Multilateral Trade Negotiations (MTN). Agreement on Implementation of Article VI of the General Agreements on Tariffs and Trade, Apr. 12, 1979, 31 U.S.T. 4919, T.I.A.S. 9650, *reprinted in* H.R.Doc. No. 153, part I, 96th Cong., 1st Sess. 313–14 (1979) (International Antidumping Code or Code).

The Code, together with other trade agreements negotiated during the MTN, was approved and implemented by passage of the 1979 Trade Agreements Act (1979 Act), which repealed the 1921 Antidumping Act. Trade Agreements Act of 1979, Pub.L. No. 96–39, § 2, 93 Stat. 147, 19 U.S.C. § 2503 (1982). The Code provides that where an export price may be unreliable because of an association between the exporter and importer, an export price may be constructed on the basis of the price at which the imported products are first resold to an independent buyer. When export price is so constructed, "allowance for costs, including duties and taxes, incurred between importation and resale, *and for*

---

**8.** Presumably, these maximum percentages were included in the Tariff Act section because importers would have benefited by large deductions of commissions or profits under the appraisement law, inasmuch as such deductions would have reduced the United States price and so in certain cases reduced dutiable value. By contrast, in calculating ESP under section 204 of the 1921 Antidumping Act, an importer will generally not benefit from a deduction of profits because deduction of profits will decrease ESP and thus increase the possibility that sales at less than fair value will be found. *See* Hemmendinger & Barringer, *supra,* 6 N.C.J.Int'l L. & Com.Reg. at 433–34.

*profits accruing,* should also be made." International Antidumping Code, art. 2, paras. 5–6 (emphasis added). In other words, the Code indicates that "profits accruing" should be deducted from a constructed export price that is the analogue of ESP.[9]

Timken argues that because a provision of this international code—implemented in 1979—provides a deduction from ESP for "profits accruing," section 204 of the Antidumping Act of *1921* should be interpreted similarly to allow for deduction of profits. Timken's argument for such consistency of interpretation is that the Code as a whole has been characterized as "consistent" with the 1979 Act; that the ESP provisions of the 1979 Act and the 1921 Act are in relevant parts identical; and that therefore the ESP provisions of the 1921 Act and of the Code necessarily must be "consistent." *See* S.Rep. No. 249, 96th Cong., 1st Sess. 1, 15–16, *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 401–02 (S.Rep. No. 249) (bill that became the 1979 Act implements the Tokyo Round of the MTN and adds a comprehensive statute that replaces the Antidumping Act of 1921 and is consistent with the MTN Antidumping Code); Statements of Administrative Action, *reprinted in* H.R.Doc. No. 153, 96th Cong., 1st Sess., part II, at 392 (1979), *and in* 1979 U.S.Code Cong. & Ad.News 665, 667 (the 1979 Trade Agreements Act approves and implements the trade agreements negotiated in the MTN and has been developed to be fully consistent with those agreements). *Compare* Tariff Act of 1930, § 772, *as amended,* 19 U.S.C. § 1677a (1982) *with* Antidumping Act of 1921, § 204.

In analyzing the current Code, it is useful to review legislative history pertaining to its *predecessor,* the 1967 International Antidumping Code. Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, June 30, 1967, 19 U.S.T. 4348, T.I.A.S. 6431, *reprinted in* J. Jackson, World Trade and the Law of GATT § 16.6, at 426–28 (1969) (1967 Code). The 1967 Code, unlike the current

Code, was never the subject of implementing legislation in the United States. S.Rep. No. 249 at 1. However, like the current Code, it included an ESP provision providing that "allowance for ... profits accruing *should also be made.*" 1967 Code, art. 2, para. f (emphasis added).

The Executive Branch in a report to Congress in 1968 attempted to demonstrate that the 1967 Code was consistent with the Antidumping Act of 1921. That report related each provision of the Code to the "relevant provisions" of the 1921 Act and to the regulations and administrative practice thereunder. Executive Branch, *Analysis of International Antidumping Code in Relation to Antidumping Act, 1921* (1968), *reprinted in* S.Comm. on Finance, 90th Cong., 2d Sess., *Text of Antidumping Act, 1921, International Dumping Code, and Related Materials* 55, 60 (Comm.Print 1968) (Comm.Print). With regard to calculation of ESP, the "relevant provision" of the 1921 Act was unquestionably section 204. In the course of an analysis of the here pertinent provision of the 1967 Code, paragraph f, the Executive Branch report stated:

> In addition, paragraph (f) provides that due allowance shall be made in each case, on its merits, for the differences in conditions and terms of sale, for the differences in taxation, and for the other differences affecting price comparability. This provision is consistent with the [1921 Antidumping Act]. *Finally, paragraph (f) provides that in the cases involving constructed export price ... allowance for costs, including duties and taxes, incurred between importation and resale, and for profits accruing, should also be made. Since this is a hortatory provision, it creates no inconsistency with the Act.*

Comm.Print 60 (emphasis added). The above analysis is notable in that it apparently found the provision of the 1967 Code concerning "profits accruing" to be not inconsistent with the relevant provision of the 1921 Act (section 204) *only* because the

---

**9.** Such constructed export price will hereinafter also be referred to as "ESP."

Code provision was "hortatory" in nature. Apparently, the word "should" in the Code provision—"allowance ... for profits accruing, *should* also be made" (emphasis added)—was understood as an exhortation rather than as a requirement. This suggests that the ESP provision of the 1967 Code was never perceived as the equivalent of section 204 of the 1921 Act but, to the contrary, was regarded as "consistent" with that section only because the Code provision was not viewed as mandatory.

Because this legislative history contradicts an argument that section 204 should be viewed as in substance identical to the ESP provision of the *1967* International Antidumping Code, it similarly contradicts Timken's argument that section 204 must be viewed as "consistent with" the ESP provision of the *current* International Antidumping Code.

Timken contends that despite this legislative history, nothing *precludes* requiring a deduction of profits under United States law so as to ensure conformity of that law with the Code provision. It further asserts that many of the trading partners of the United States deduct profit from ESP, and that a failure to interpret United States law to provide for such a deduction creates a disparity that operates to the detriment of domestic industry in contravention of the general intent of Congress that the antidumping law protect such industry. *Cf. J.C. Penney Co. v. United States Treasury Department*, 439 F.2d 63, 64 (2d Cir.), *cert. denied*, 404 U.S. 869, 92 S.Ct. 60, 30 L.Ed.2d 113 (1971) (the Antidumping Act is designed to prevent actual or threatened harm to a domestic industry caused by the sale of merchandise at prices lower than those in the country of origin). But even assuming, *arguendo*, that the Code provision regarding "profits accruing" should be given effect under the implementing 1979 Trade Agreements Act in order to ensure conformity with the Code, it would not follow that the *1921* Act provision here in question should be interpreted so as to conform with the Code. *Cf. United States v. Philadelphia National Bank*, 374 U.S. 321, 348–49, 83 S.Ct. 1715, 1733–34, 10 L.Ed.2d 915 (1963) (views of a subsequent Congress form a hazardous basis for inferring intent of an earlier one); *Giardino v. Commissioner*, 776 F.2d 406, 409 (2d Cir. 1985) (court would not venture beyond clear meaning of statute because, although clear meaning was contradicted by subsequent legislative history, it did not result in absurdity). In addition, legislative history indicates that Congress, in passing the 1979 Act, intended to preserve the status quo as to all administrative practice regarding the antidumping laws except where specifically noted. *See* S.Rep. No. 249 at 93, 107, *reprinted in* 1979 U.S.Code Cong. & Ad.News at 479, 493; *Brother Industries, Ltd. v. United States*, 3 CIT 125, 136, 540 F.Supp. 1341, 1353–54 (Senate Finance Committee did not disapprove the current regulations and administrative practice under the 1921 Act, but in effect preserved the status quo), *aff'd sub nom. Smith-Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984); *cf. Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (Congress is presumed to be aware of administrative or judicial interpretation of a statute).

In short, although Timken raises provocative questions regarding the appropriateness of an antidumping law that conflicts in part with the law of our trading partners in a manner detrimental to United States industry, it has presented no basis for interpreting section 204 in light of the International Antidumping Code provision.

*5. Non-absurdity of Results*

Finally, Timken argues that unless section 204 is interpreted so as to require the deduction of profits as well as commissions, the consequence is an absurd result, inconsistent with the underlying purpose of the provisions regarding ESP. Thus, Timken points out that if profits are not deducted from ESP, dumping margins may differ substantially depending upon whether a foreign manufacturer elects to sell in the United States through (1) an agent selling

the merchandise on consignment and receiving a commission, or (2) through a subsidiary purchasing the imported merchandise and then reselling it, earning a profit. Timken contends that in substance those import transactions are identical, and that Congress did not intend that the form of transactions could be structured to eliminate or reduce dumping margins.

Timken also notes that ESP is defined in such manner as to make it "[i]n substance, the net amount *returned to the foreign exporter.*" S.Rep. No. 16, 67th Cong., 1st Sess. 12 (1921) (emphasis added); *see Brother Industries, Ltd. v. United States,* 3 CIT at 141 n. 13, 540 F.Supp. at 1357 n. 13. According to Timken, if profits are not deducted from ESP, ESP will equal "the net amount returned to the foreign exporter" *plus* the subsidiary's profit, and so will be in conflict with this underlying definition. However, Congress could reasonably have determined that a foreign exporter and its United States subsidiary should be treated as one "pocket" for purposes of determining what net amount is "returned to the foreign exporter." Indeed, the very nature of ESP calculation, requiring the deduction from an arm's length resale price of readily verifiable amounts, indicates that in the context of ESP calculation Congress wished to stay away from any assessment of the legitimacy or significance of monetary transactions between related parties. Certainly it is possible, as Timken itself points out, that related corporations could show profit in whatever place—the United States or abroad—was most convenient for them. The fact that such manipulation is theoretically possible is a reasonable basis for including in "net amount returned to the foreign exporter" the profit going to *both* the foreign exporter and to its United States subsidiary.

Another reason for permitting a subsidiary's *profit* on resale of imported goods to *increase* ESP—in effect, treating a subsidiary's profit as part of the "net amount returned to the foreign exporter"—is that, regardless of how the word "commissions" is interpreted, any *loss* incurred by a subsidiary will *decrease* ESP—in effect, de-

creasing the "net amount returned to the foreign exporter." Congress could reasonably have determined that because, for purposes of calculating ESP, a foreign exporter and its subsidiary are effectively treated as one unit when the subsidiary has incurred a loss, that those parties should similarly be treated as one unit when the subsidiary has made a profit. A statutory scheme under which profit is not deducted from ESP is therefore hardly absurd. Consequently, the ITA's interpretation of the word "commissions" to mean only commissions, and not "commissions and profits," is reasonable.

### B. *Cost-value Relationship*

Timken contends that the ITA erred in making adjustments for differences in circumstances of sale based on the *costs* of those differences.

■ In determining whether goods have been sold in the United States at less than fair value, the ITA must compare the United States price of the goods with the foreign market value of identical or similar goods. However, United States price and foreign market value may differ for reasons that do not implicate the fairness of the foreign trade practices of the exporter. For example, foreign market value and United States price may be influenced by differences in the chain of commerce by which the goods reached the export or domestic market. Accordingly, in comparing foreign market value with United States price, the ITA must adjust foreign market value for differences in the circumstances of sale of the goods.

Section 202 of the 1921 Act provided in part:

(c) In determining the foreign market value ... if it is established to the satisfaction of the Secretary or his delegate that the amount of any difference between the exporter's sales price and the foreign market value (or that the fact that the exporter's sales price is the

same as the foreign market value) is wholly or partly due to—

\* \* \* \* \* \*

(2) other differences in circumstances of sale....

\* \* \* \* \* \*

then due allowance shall be made therefor.

Antidumping Act of 1921, § 202, 19 U.S.C. § 161 (1976). An implementing regulation provided:

In determining the amount of the reasonable allowances for any differences in circumstances of sale, the Secretary will be guided primarily by the *cost* of such differences to the seller but, where appropriate, may also consider the effect of such differences upon the market value of the merchandise.

19 C.F.R. § 153.10(c) (1979) (emphasis added). In *Smith-Corona Group v. United States*, 713 F.2d 1568 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984), the Federal Circuit upheld a regulation virtually identical to section 153.10(c). There Smith-Corona contended that the preference for cost established by the regulation is inconsistent with the underlying statutory requirement that claimed differences in circumstances of sale must result in differences in price or value—not cost. The court rejected the argument on the ground that the assumption underlying the regulation—that differences in price or value are very likely to exist where there are differences in cost— was reasonable. 713 F.2d at 1577. The court noted that precluding the ITA from making that assumption would require it to engage in "extensive complex econometric analysis," and that making such an assumption "may be the only *practical* way to administer the statute." *Id.* at 1577 n. 27 (emphasis in original). Yet, in language now relied upon by Timken, the court also stated:

The Secretary may not, however, rely on cost *to the exclusion* of its effect on value. The regulation does not *prohibit* reliance on value, but merely expressed a

preference for cost; value may be considered where appropriate.

*Id.* at 1577 (emphasis in original). The court further stated:

We do not hold that the Secretary may blindly rely on cost to the exclusion of its effect on value.... *[A]bsent evidence that costs do not reflect value*, the Secretary may reasonably conclude that cost and value are directly related.

*Id.* at 1577 n. 26 (emphasis added).

■ In this case, the ITA made adjustments for differences in circumstances of sale based upon cost information. Timken claims that those adjustments were unwarranted because it had presented evidence to the ITA that the differences in cost did not in fact result in a difference in the value of the goods. The evidence thus referred to is data showing that when certain costs *increased*, including those costs reflecting differences in circumstances of sale, the price of foreign market goods in many cases *decreased* or stayed the same. According to Timken, in only a few instances did prices rise in conjunction with a rise in costs. Hence, Timken argues, it is clear that the costs reflecting differences in circumstances of sale did *not* increase the value of the goods and therefore foreign market value should not have been adjusted to reflect those costs. In so arguing, Timken relies upon the *Smith-Corona* language: *"absent evidence that costs do not reflect value*, the Secretary may reasonably conclude that cost and value are directly related." *Id.* (emphasis added).

In effect, Timken's position is that the data establishing that as certain costs went up, price went down or stayed the same, constitutes evidence that "costs do not reflect value," and so makes unreasonable the ITA's usual assumption that costs are reflected in value. The court disagrees. The ITA's assumption, reflected in its regulation, of a relation between cost and value, does not hold good only in cases in which there is a positive correlation between prices and specific costs. Prices are influenced by many factors other than costs, *e.g.*, market demand, competition, and vol-

ume of sales. Furthermore, where the costs in question are not total costs, but merely costs of differences in circumstances of sale, such additional factors may well have a proportionately greater impact on price than do increases in those costs. Thus, costs of differences in circumstances of sale may be directly related to value and yet not control final price. Given this, Timken's evidence that prices did not increase with the rise in certain costs did not establish that values did not increase together with those cost increases; it at most established that values and/or prices were influenced by other factors as well.

■ Timken contends also that once it had presented data showing the absence of a positive correlation between costs and prices, it became incumbent upon NTN to rebut that evidence by affirmatively establishing that cost did indeed influence value. The argument is misplaced. The assumption of a cost-value relation implicit in the regulation and sanctioned by *Smith-Corona* is not a burden-shifting device. *See id.* It is rather an assumption embodying the informed judgment of an agency charged with the responsibility of administering the statute. Upon presentation of Timken's data on cost and price, the ITA's task was to determine whether, in light of that evidence, its assumption of a positive relation between cost and value *continued* valid. The ITA decided that it did, and the court finds that decision reasonable. For, as discussed above, prices may be influenced by many factors, so that an assumption that higher costs result in higher values is not undermined by the fact that certain relatively small cost increases do not coincide with price increases.[10]

### V. *Conclusion*

This action is remanded to the ITA for (1) collection and review of data for a period extending up to the date of the ITA's pre-liminary determination; (2) collection and review of additional home market sales data for the period of time already reviewed by the ITA, and for reassessment of proper TRB model comparisons; (3) review of the accuracy of all pertinent NTN production costs; (4) correction of all errors that may have occurred below; and (5) recalculation of dumping margins in a manner consistent with this opinion. The ITA is directed to report its findings to the court within one hundred twenty (120) days of the date of this order.

---

10. The court has considered the remaining contentions of the parties and finds either that they are without merit, or that the court's determination to remand this action makes those contentions either moot, or not appropriate for consideration at this time. *See Ford Motor Co. v.* *NLRB*, 305 U.S. 364, 372-76, 59 S.Ct. 301, 306-08, 83 L.Ed.2d 221 (1939) (it is familiar appellate practice to remand causes for further proceedings without deciding the merits, where justice demands that course in order that some defect in the record may be remedied).